1

2                                                              The Honorable Ricardo S. Martinez

3

4

5

6

7                                    UNITED STATES DISTRICT COURT
                                    WESTERN DISTRICT OF WASHINGTON
8                                              AT SEATTLE

9    AMAZON.COM, INC.                          )
                                               )      No. 2:19-cv-01176-RSM
10                          Plaintiff,         )
                                               )      AMAZON'S MOTION FOR
11        v.                                   )      PRELIMINARY INJUNCTION
                                               )
12   PHILIP MOYER,                             )      NOTE ON MOTION
                                               )      CALENDAR:
13                          Defendant.         )      September 12, 2019 @ 10:00 a.m.[1]
                                               )
14   _____       )      ORAL ARGUMENT REQUESTED

15

16

17

18

19

20

21

22

23

24

25

26

27   _____
     [1] The hearing time was set by stipulated order in the event the Court allows oral argument on Amazon's motion.

MOTION FOR PRELIMINARY INJUNCTION

(2:19-cv-01176-RSM)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

## I.    INTRODUCTION AND RELIEF REQUESTED

This is a noncompete case involving the cloud computing industry.

Cloud computing is the on-demand delivery of computing power, software, storage, and other information technology services via the internet.  It is a newer industry and growing quickly, but already generates billions and billions of dollars in revenue each year.  Amazon Web Services ("AWS")[2] and Google Cloud are head-to-head cloud competitors.

For the last two and a half years, Phil Moyer has been a sales executive at AWS.  He focused on selling AWS's cloud services to customers in the financial services industry, but was intricately involved in developing AWS's services applicable to all industries as well as crafting AWS's strategy for selling those services to customers in all industries.  Because of his focus on customers in the financial services industry, he was especially deep in developing AWS's strategies for selling cloud services to customers in highly regulated industries—like financial services and healthcare—which have regulatory requirements necessitating heightened levels of reliability, security, and privacy.

Reportedly, Google has recently been desperate to "overhaul its customer operations, which have struggled with a smaller staff and longer lead times than its competitors."[3] Consistent with that report, Google offered ███████████████ if he jumped ship to Google Cloud to focus on selling Google's Cloud services into the healthcare industry, with the intent that he would assume responsibility for all regulated industries "in the fullness of time."  Moyer Dep., 44:7-21; Bugaighis Decl., Ex. 11 at Google 22.  Google's new President of Google Cloud Sales Rob Enslin opined in his interview appraisal of Moyer that, based on Moyer's work with AWS's financial services clients, "████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[2] AWS is Amazon Web Services, Inc., a wholly owned subsidiary of Amazon.com, Inc.

[3] Bugaighis Decl., Ex. F (https://www.bizjournals.com/sanjose/news/2019/04/18/goog-cloud-robert-enslin-hiring-compete-amzn-msft.html).

MOTION FOR PRELIMINARY INJUNCTION - 1
(2:19-cv-01176-RSM)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████████

3 ██████████████████████████████████  ██████████████████████

4 ██████████████████████████████████████████████████████████

5 ████████████████████████████████████████. *Id.*

at Google 12.  Make no mistake, though, what Google wanted was Moyer's knowledge of

AWS's strategies.  Just 30 months earlier, Google had declined to offer Moyer a lesser regional

sales role.  But once he acquired a couple of years of experience as a sales executive at AWS,

Google thought he was not just worth hiring, but worth ████████████████████████

██████████████████████.

Google knew Moyer had a noncompetition agreement with Amazon, but was so

desperate to grow its "enterprise" cloud business that it did not care.  Google hired Moyer as a

Google Cloud Vice President ***before*** receiving a copy of his signed noncompetition agreement,

with little to no knowledge (or concern) about the confidential information he had obtained at

AWS.  Bugaighis Decl., Ex. A (Enslin Dep.) at 50:8-51:1.  Although Google originally

suggested to Amazon that it would not assign Moyer to run its financial services business in

deference to his noncompete, at deposition Google later confessed that wasn't true and it had

already hired someone for that position before Moyer was interviewed.  *Id.* at 160:9-13.

Google's President of Cloud Sales also confirmed that in his new position Moyer would be

expected to participate in meetings that include all of its business lines, during which he would

be free to suggest strategies, product improvements, and the like.  *Id.* at 136:5-139:4.  In other

words, if allowed to do so, Moyer would not only help craft Google's cloud strategy, he would

walk into meetings with customers and tell them why they should choose Google Cloud rather

than AWS in direct violation of his noncompete.

---

[4] As part of the limited, expedited discovery allowed in connection with this preliminary injunction motion, Amazon took a Rule 30(b)(6) deposition of Google.  Google provided Rob Enslin, President, Google Cloud, as its representative.  Cited excerpts of Enslin's 30(b)(6) testimony (which is sometimes referenced as the testimony of Google) are attached to the Bugaighis Declaration as Exhibit A.

MOTION FOR PRELIMINARY INJUNCTION - 2
(2:19-cv-01176-RSM)

1    Belatedly, Moyer and Google set about crafting a litigation narrative that they hoped

2    would justify their disregard of his noncompete: they would argue that Moyer's new job running

3    Google Cloud's "healthcare vertical" has **nothing to do with** his work at AWS, and that ███

4    ████████████████████████████████████████████████████████" *See* Enslin

5    Dep, 35:1-21.  Amazon uncovered through discovery that Google even changed the job

6    responsibilities listed in its internal hiring file before sharing an abridged description with

7    Amazon.  Google deleted references to "regulated environments," "manag[ing] compliance,"

8    work with "System Integrators" and the development of "Go-To-Market capabilities," as well as

9    the "ability to run other industries if necessary (e.g. Financial Services)," Google 10.  Those

10   responsibilities **were listed on Moyer's own resume describing his work at AWS**, so including

11   them in Google's description of Moyer's new job would have made plain that it violates his

12   noncompete.  Google 12.  Next, during his deposition, Google's President of Cloud Sales

13   backtracked on his earlier statement that "████████████████████████████████████

14   ████████████████" and denied there is **any** similarity between healthcare and financial

15   services.  Enslin Dep., 110:4-9.  Moyer too played a part.  Immediately before resigning from

16   AWS, Moyer attempted to erase everything from his Amazon laptop in an effort to cover his

17   tracks and hide the extent to which he had been involved in AWS's confidential and strategic

18   planning processes.  *See* Stenhouse Declaration ("Stenhouse Decl.").  However, after AWS

19   figured that out and confronted him during his deposition with a log demonstrating that he had

20   accessed and commented on the most confidential strategy and planning documents for AWS's

21   entire cloud business—including strategies for growing its healthcare business—Moyer changed

22   tack and testified that he had forgotten everything, had no competitively useful knowledge of

23   AWS's business, and had been little more than a glorified order taker from a list of 32 financial

24   services customers. *E.g.*, Bugaighis Decl., Ex. B (Moyer Dep.), 211:12-19 (denying, on cross by

25   his own counsel, having an "independent recollection" of documents he downloaded and

26   commented on).

27

MOTION FOR PRELIMINARY INJUNCTION - 3
(2:19-cv-01176-RSM)

As detailed in nine sworn declarations and the voluminous documentation submitted by Amazon in support of this motion, Moyer's revisionist spin on both his work at AWS, and the risks to AWS's business, are demonstrably false:  Moyer has knowledge of AWS's confidential strategies for its cloud business, unreleased products and roadmaps, the gaps in its existing services, customer "blockers," business terms, its budgets and growth plans—even its plans to compete with Google; the list goes on and on.  ***In fact, Moyer had a meeting regarding and downloaded, reviewed, and commented on a document laying out AWS's confidential strategies <u>in healthcare</u> weeks before resigning***.  Banks Decl., ¶¶ 4-8. 12-14, 17 & Exs. A-D.

In the waning moments of his August 9 deposition, Mr. Moyer reluctantly conceded that Amazon had, in fact, entrusted him with its most confidential strategies for its entire cloud business:

> Q:     Amazon entrusted you with all of the information that is reflected in the documents listed on [the worklog], correct?
>
> A:     **I –**
>
> . . .
>
>        MR. FRANCIS:   Hold on.  Objection. Vague. Compound.
>
> A:     **-- I – I was exposed to the information that was in those documents because I had valid business reasons to – to literally be a – a comm[ent]er on documents.**
>
> Q:     Right.
>
> A:     **And – and, yeah, so they wanted my opinion.  They wanted input from me on these documents.**
>
> Q:     Right.  And those documents, as you like to say, to be very clear, contain the confidential business strategies of AWS across its cloud business, correct?
>
>        MR. FRANCIS:  Objection.  Vague as to time.
>
> A:     **It contains – they – they contain some confidential information.  Some's public. Some is public.**
>
> . . .

MOTION FOR PRELIMINARY INJUNCTION - 4
(2:19-cv-01176-RSM)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Q:      Including the strategy for ██████ came out three weeks before you left the company.

That was entrusted to you by AWS, correct?

A:      **That I'm not positive about.  I can't answer that definitively because I'm not sure if that document was revised or what happened with that.  And, quite frankly, I don't recall the details in that document.**

Moyer Dep, 216:19-218:17.

This is not a close case:  Mr. Moyer's work as a Vice President for Google Cloud will be a breach of his noncompetition agreement with Amazon, Amazon will be harmed by the breach in innumerable (and, in some respects, immeasurable) ways, and for the reasons set forth below, Amazon respectfully requests that the Court enter a preliminary injunction enjoining Phil Moyer from serving as the Vice President, Healthcare, Google Cloud, until a final decision on the merits or November 22, 2020, whichever comes first.[5]

## II.      STATEMENT OF FACTS

### A.      AWS and Google Cloud

Cloud computing is the on-demand delivery of computing power, software, storage, and other information technology services via the internet.  Fallon Declaration ("Fallon Decl."), ¶ 3; *see also* Enslin Dep., 14:13-15:1.  A cloud computing provider operates and maintains the computer hardware and software required for these services so that customers can access and use what they need via the internet.  *Id.*  Customers essentially "rent" the specific computing resources they need, when they need them, either in place of or in conjunction with their own existing computing infrastructure.  *Id.*

AWS offers over 165 cloud services to millions of customers and partners from data centers globally, with a multitude of products and services that are under development.  AWS provides "one to many" cloud offerings, meaning that AWS offers the full menu of cloud

---

[5] In order to ensure that it would not confront a moving target, Amazon asked Moyer and Google to confirm that it was their intention to employ Moyer as Vice President, Healthcare, Google Cloud, and that Amazon would not be presented with a different or shifting role after it had taken discovery and prepared its motion.  Amazon was assured that would not happen.

MOTION FOR PRELIMINARY INJUNCTION - 5
(2:19-cv-01176-RSM)

products and services to all of its customers.  Fallon Decl, ¶ 9.  AWS service teams develop services that have broad applicability, across industries, and offer services in groups according to customer need, such as analytics, business applications, computer, machine learning, and network and content delivery, among others.  *Id.*  AWS segments cloud sales teams into "verticals" by business industry (such as telecommunications, financial services, and healthcare and life sciences) and by customer attributes (such as Global and Strategic Accounts, Startups, and Geographies).  Clayville Declaration ("Clayville Decl."), ¶ 4.  AWS uses the financial services industry ("FSI") vertical to test best practices for AWS cloud adoption strategy across other geographies and industries, including spearheading initiatives or cross-vertical sales efforts that serve to benefit greater customer migration to AWS.  *Id.*

While AWS was among the first to offer cloud computing services, the business is highly competitive, and driven by innovation.  Google Cloud competes directly with AWS.  As conceded by both Google and Moyer, Google Cloud competes with AWS for business in financial services, healthcare and life sciences, and other parts of the cloud industry.  Enslin Dep., 44:23-46:3; Moyer Dep., 4:18-5:8; 10:4-19 (Google Cloud and AWS compete for financial services and healthcare clients).  Google Cloud's own website maps its services to AWS so that potential customers can identify which Google services offer similar functionality to AWS.  https://cloud.google.com/free/docs/map-aws-google-cloud-platform.  Google provides a guide that compares Google Cloud with AWS, highlights similarities and differences in Google Cloud and AWS service offerings, and maps Google products, concepts, and terminology to the corresponding AWS products, concepts, and terminology. *See* https://cloud.google.com/docs/ compare/aws/.

### B. Moyer Promises Not to Compete With Amazon for 18 Months After Leaving Its Employ.

Phil Moyer joined AWS on March 13, 2017 as a Director of Sales for Financial Services, a senior management position.  Peku Declaration ("Peku Decl.") ¶ 5; Fallon Decl. ¶ 8.  Moyer's job focused on selling AWS cloud services to companies in the financial services

MOTION FOR PRELIMINARY INJUNCTION - 6
(2:19-cv-01176-RSM)

industry, however, his responsibilities as an AWS executive extended well beyond that single "regulated industry" and gave him insight into AWS's services, sales efforts, and strategies, including those that would be applied to clients in the healthcare industry and geographies around the world.  Fallon Decl. ¶ 8; *see* Moyer Dep., 105-129 (discussing long list of highly confidential business plans for entire cloud business that were reviewed by Moyer).

    As a condition of his employment, Moyer executed a Noncompetition Agreement, Peku Decl. Ex A, which provides in part: (1)  for 18 months after leaving Amazon, Moyer will not "directly or indirectly" "engage in or support the development, manufacture, marketing, or sale of any product or service that competes . . . with any product or service sold, offered, or otherwise provided by Amazon . . . that Employee worked on or supported, or about which Employee obtained or received Confidential Information." ¶ 4.1; and (2)  for 18 months after leaving Amazon, Moyer will not accept or solicit business from any Amazon customer of any service or product that Moyer worked on or supported, or about which he obtained confidential information. ¶ 4.2.  Moyer acknowledged that the noncompetition covenant may "significantly limit Employee's future flexibility in many ways," that "the geographic areas applicable to certain restrictions" are "extremely broad and in many cases worldwide"  and that the restrictions "are reasonable in scope, area, and duration, and will not result in any undue hardship for Employee," *Id.* ¶ 4(a); he agrees injunctive relief is appropriate to enforce the agreement and prevent irreparable harm.  ¶ 7.4.  The Noncompetition Agreement contains an integration clause disclaiming all prior representations. *Id.*, ¶ 7.8.[6]

---

[6] Moyer claimed for the first time at his deposition, and later supplemented his Interrogatory Answers to reflect, that an unnamed "recruiter" told him that Amazon does not enforce noncompetition agreements against "sales people" so "long as the salesperson called on a different set of customers" than at Amazon.  Aside from the fact that Moyer was not a salesperson, but a ***sales executive***, Moyer's vague and belated "recollection" is inadmissible hearsay from an unidentified person who is not a speaking agent of Amazon.  Moyer admits he voluntarily signed the Noncompetition Agreement containing an unambiguous noncompetition provision, and the Agreement contains an integration clause barring the arguments it appears he intends to make in this case.

MOTION FOR PRELIMINARY INJUNCTION - 7
(2:19-cv-01176-RSM)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**C.** **Moyer's Intimate Involvement in Amazon's Cloud Sales and Services Strategy**

Moyer not only had access to substantial information regarding unreleased Amazon services and healthcare sales strategies, Moyer actively participated in developing these services and strategies.  *See* Banks Decl. ¶¶ 4-18; Clayville Declaration ("Clayville Decl.") ¶¶ 4-22; Carlton Declaration ("Carlton Decl.") ¶¶ 5-9; Gandarillas Declaration ("Gandarillas Decl.") ¶¶ 4-9; Neault Declaration ("Neault Decl.") ¶¶ 4-11.

In order to sell cloud services, all sales employees (and especially sales executives who set sales strategy like Moyer) must first understand AWS cloud services and AWS's cloud service roadmap.  Fallon Decl. ¶ 10.  In order to attract customers, AWS must demonstrate that its cloud computing business is a viable, reliable, and beneficial method for satisfying customers' computing needs.  *Id.*  This is especially important in certain industries such as financial services and healthcare.  *Id.*  Moyer's work was not limited to "financial services." Like other AWS executives, Moyer was responsible for understanding:  (1) AWS's existing and projected services; (2) the value and efficiency those services deliver to customers; (3) the limitations, gaps, and weaknesses, of those services; (4) what AWS services are forthcoming to address customer needs and service gaps; (5) how to obtain customer specific cloud service features and functionalities; (6) the service, pricing, storage volume, and workload capacity terms on which AWS provides those services to its customers; and (7) how AWS positions itself against other cloud computing companies—including Google Cloud—to best satisfy customer needs. Fallon Decl. ¶ 10.

It was also Moyer's job to understand and analyze customers' needs so that he and his team could remove obstacles (or "blockers") to those customers using AWS cloud services. Fallon Decl.  ¶ 11.  To do that, he regularly communicated with both customers (on one hand) and AWS's partner and service development teams (on the other hand) to discuss features that customers requested, wanted, or needed, features that were currently on AWS's roadmap for release, and what it would take to develop any additional features.  *Id.*  ¶ 12.

MOTION FOR PRELIMINARY INJUNCTION - 8
(2:19-cv-01176-RSM)

Moyer was tasked with understanding how AWS manages customers in regulated industries such as FSI and healthcare.  Clayville Decl. ¶ 15.  Both financial services and healthcare are highly regulated industries that share security, compliance, and privacy concerns. *Id.*; Gandarillas Decl. ¶ 8.  Because of the high level of regulation, financial services and healthcare also share many inhibitors to cloud adoption and require AWS to react quickly to each customer's needs to ensure resiliency and stability such that the customer meets all regulatory and compliance requirements for handling customer confidential information. Clayville ¶ 15; Fallon Decl. ¶ 13.

Thus, Moyer was not a narrowly focused middle manager who was siloed in financial services.  Moyer frequently discussed and consulted with his colleagues regarding customers in other highly regulated areas, such as healthcare.  Fallon Decl. ¶ 14 & Ex. B; Clayville Decl. ¶ ; Banks Decl. ¶ 18; Gandarillas ¶ 8.  Moyer was a member of AWS's Worldwide Commercial Sector's extended leadership team that sets sales strategy for the ***entirety*** of AWS cloud globally, except the public sector and greater China.  Clayville Decl. ¶¶ 4-6, 9.  He was an active and vocal participant in monthly metrics meetings and provided critical feedback on comprehensive sales strategies, including those concerning healthcare and life sciences strategy.  *Id.* ¶¶ 6-10 & Exs. A-E; Banks Decl. ¶¶ 11-18.  Moyer was also a weekly participant in extremely confidential business reviews concerning the Top 100 enterprise customers for the majority of AWS's cloud, including healthcare.  Fallon Decl. ¶ 20 & Ex F.  ***In bi-yearly extended leadership meetings, Moyer viewed, annotated, and commented on dozens of highly confidential documents regarding the entirety of World Wide Commercial Sales strategy for Amazon, including multiple documents that discussed in detail Amazon's strategies with respect to healthcare and life sciences customers***. Clayville Decl. ¶¶ 6-10 & Exs. A-E; Peku Decl., Ex. C (WorkDocs log showing Moyer actions on highly confidential documents related to entire cloud business).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1      Moyer lead multiple AWS sales, services, and customer initiatives ***across industries***,

2 and participated in reviewing and crafting highly confidential operational planning documents

3 (the OP1 and OP2s) for numerous units of AWS, materials that Moyer admitted were both

4 "confidential" and "important" (Moyer Dep, 219:18-220:4).  Some examples, as detailed

5 further in the declarations, include:

6    •  ███████████████████████████████████

7    ███████████████████████████████████████

8    ██████████████████████████████████████

9    ██████████████████████████████████████

10    ██████████████████████████████████

11    ████████████████████████████████████████

12    █████████████████████████████████████

13    ██████████████████████████████████████

14    ███████████████████████████████████

15    █████████████████████████████████████

16    ████████████████████████████████████████

17    ███████████████████████████████████████

18    ████████████████████████████████████████

19    ████████████████████████████████████████

20    ████████████████

21    ███████████████████████████████████████

22    █████████████████████████████████████

23    ███████████████████████████████████████

24    ██████████████████████████████████████

25    ██████████████████████████████████████

26    ███████████████████████████████████

27

MOTION FOR PRELIMINARY INJUNCTION - 10
(2:19-cv-01176-RSM)



MOTION FOR PRELIMINARY INJUNCTION - 11
(2:19-cv-01176-RSM)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax



MOTION FOR PRELIMINARY INJUNCTION - 12
(2:19-cv-01176-RSM)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1 ███████████████████████████████████████

2 █████████████

3      In addition, Moyer is well-versed on AWS's terms and strategies for negotiating

4 agreements with some of AWS's top customers, which are consistent across regulated

5 industries.  Fallon Decl. ¶¶ 23-24; Clayville Decl. ¶ 21.   Moyer knows AWS's negotiation

6 strategies and most sensitive contracting limitations and fallbacks, allowable incentives,

7 financial targets, capacity limitations, which terms were flexible and which were rigid, the

8 pricing strategies AWS used in various scenarios, and the final pricing.  *Id.*  Moyer touted his

9 ███████████████████████████████████████

10 ██████" in the resume he provided to Google.  Bugaighis Decl., Ex. I at Google 12.  With

11 this knowledge, Mr. Moyer could undercut AWS's in negotiating with customers on behalf of

12 Google.  Fallon Decl. ¶ 24; Clayville Decl. ¶¶ 21-22.  Any one of the critical roles played by

13 Moyer in AWS's cloud business would be sufficient to support injunctive relief.  Collectively,

14 they present an overwhelming case for enforcement of the Noncompetition Agreement.

15      **D.      Moyer Leaves to Join Google's Competitive Cloud Business.**

16      In April 2019, Moyer advised Amazon that he was contemplating departing for a

17 position as the Chief Executive Officer of a company called Star Compliance.  Fallon Decl.

18 ¶ 25.  The parties discussed what it might take to keep Moyer at Amazon; the company could

19 not meet his demands, but had no philosophical objections to his new position.

20      On May 22, Moyer unexpectedly informed Amazon that he was not leaving for Star

21 Compliance, but had instead accepted a position in Google's rival cloud business.  Fallon Decl.

22 ¶ 27.  Amazon was alarmed, and its lawyers contacted Google's counsel that same day.

23 Bugaighis Decl, ¶ 2.  Amazon had no objection to Moyer joining Google, but requested that

24 Google place Moyer in a position outside of its cloud business that would not blatantly trade on

25 his extensive knowledge of Amazon's competitive services and strategies.  *Id.*

26

27

MOTION FOR PRELIMINARY INJUNCTION - 13
(2:19-cv-01176-RSM)

On May 30, Google's counsel sent Amazon an email that purported to provide "more information re the VP Healthcare role."  Bugaighis Decl, ¶ 15 & Ex. M.  Through discovery, Amazon learned that Google had altered the responsibilities for Moyer's position, and had misstated Google Cloud's own views on whether Moyer's work at AWS was related to his new role. ██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████ *Id.*, Ex. I at Google 11.  The VP would "████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████" *Id.*   These responsibilities mirror Moyer's own description of his work for AWS in the resume he submitted to Google: managing "sales and technical teams" which support "AWS's largest global customers"; building capability to implement cloud at scale to highly regulated industry; "built go-to-market strategy with strategically important ISVs and market utilities": negotiated terms and pricing in "Enterprise Agreements"; and "supporting some of the largest cloud migrations in the financial industry." *Id.*, Ex. I at Google 12.

Google's interview notes confirm that Moyer did ***not*** act as a narrowly focused sales manager at AWS and would ***not*** do so at Google, but was instead expected "to have a critical role in shaping [Google's] verticals strategy." *Id.* at Google 7.  The President of Google Cloud opined that the "██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████" *Id.* at

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

Google 23.  He was asked how he would attack the healthcare industry, and he offered the

█████████████████████████████████████████████████████  *Id.* at Google 26.

### E.     Moyer Deletes the Entirety of His Amazon Laptop Prior to Returning it to Amazon Despite Knowing Forensics Were Required.

On the day of his resignation, both Moyer's manager (Mr. Fallon) and his human

resources representative (Ms. Peku) called and asked Moyer to return his "computer

immediately."  Moyer Dep. at 133:2-7.  Instead of returning the computer (which was Amazon

property), Moyer claims he "started deleting things" and then decided: "***I'm just gonna delete***

***everything.***"  *Id.*, at 132:11-133:7 (emphasis added).[7]  By the time Amazon received its laptop,

Moyer had wiped it clean.  Stenhouse Decl. ¶¶ 7-12.  Moyer testified (without explanation) that

Amazon's request was somehow "ominous," but his justification for destroying critical

evidence is disingenuous.  Moyer Dep. at 134:17-136:3.  A year prior to his resignation, Moyer

was the manager for an employee departing to Oracle, and was asked to assist in securing the

employee's laptop so the company could run forensics.  Bugaighis Decl. ¶ 16.  Moyer deleted

everything on his laptop ***despite*** knowing (***and likely because he knew***) that Amazon intended

to run forensics on its contents.  Thus, by his own hand, Moyer knowingly destroyed much of

the evidence that would have informed the Court on the scope of his work for Amazon,

including his work in the days and weeks prior to his departure.  The limited evidence that was

retrievable showed that Moyer was reviewing highly confidential materials up until the eve of

his departure.  Stenhouse Decl. ¶ 12 & Ex. B.

## III.     ARGUMENT

A party seeking a preliminary injunction must show: (1) that it is likely to succeed

on the merits, (2) that it is likely to suffer irreparable harm without the preliminary relief, (3) the

balance of equities tips in its favor, and (4) an injunction is in the public interest.  *See Marlyn*

*Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009) (quoting

---

[7] Even this part of Moyer's story appears to be untrue.  The forensic examination of the scrubbed laptop shows bulk deletions on May 19th and 20th, which was ***before*** Moyer gave notice of his plan to leave for a position with Google on May 22nd.  Stenhouse Decl., Ex B.

MOTION FOR PRELIMINARY INJUNCTION - 15
(2:19-cv-01176-RSM)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  Under the Ninth Circuit's sliding scale test, a strong showing on the merits justifies preserving the status quo even in cases with less substantial irreparable harm.  *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) ("[W]e join the Seventh and the Second Circuits in concluding that the 'serious questions' version of the sliding scale test for preliminary injunctions remains viable after the Supreme Court's decision in *Winter*. . . . ").

Here, Amazon satisfies all four criteria: (1) Amazon has a right to enforce the Noncompetition Agreement; (2) Amazon will likely suffer irreparable harm if Moyer is allowed to breach the contract by crafting strategies for Google Cloud and developing and selling products and services that compete directly with those he developed and sold for Amazon; (3) the damage that Amazon will suffer from this unfair competition far outweighs Moyer's potential loss of ███████████; and (4) the public either has no interest in this dispute, or would support the enforcement of the parties' contract.  Moyer cannot serve as a Vice President for Google Could during the term of his noncompete without using Amazon's confidential and proprietary information to Google's advantage.  His plans to do so are a clear breach of his obligations to Amazon, and Amazon's rights will not be protected in the absence of an order from this Court. *See* Moyer Dep., 29:16-30:5 (refusing to commit that he was even obligated to refrain from soliciting AWS's financial services clients).

### A.    Amazon Is Likely to Succeed on Its Breach of Contract Claim.

Washington courts routinely enforce covenants not to compete—including Amazon's noncompetition covenants—when the restrictions imposed on an employee are reasonably necessary to protect the employer's business or goodwill.  *Perry v. Moran*, 109 Wn.2d 691, 698 (1987), *modified on reconsideration*, 111 Wn.2d 885 (1989).  Reasonable agreements are enforceable by way of injunctions, especially where, as here, the noncompetition agreement "concedes that in the event of breach of the post-employment competition provision, [the former employer] shall be entitled to injunctive relief, because [breach] would cause irreparable

MOTION FOR PRELIMINARY INJUNCTION - 16
(2:19-cv-01176-RSM)

injury." *Estee Lauder Cos. v. Batra*, 430 F. Supp. 2d 158, 174 (S.D.N.Y. 2006) (granting preliminary injunction); *see also Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) (affirming permanent injunction; finding irreparable injury where the employment contract conceded breach entitled the employer to injunctive relief).

### 1.   The Noncompetition Agreement's Limited Noncompetition Restrictions Are Necessary to Protect Amazon's Interests.

The limited Noncompetition Covenant to which Moyer agreed is necessary to protect Amazon's legitimate interest in its confidential information, strategies, and customer relationships, all of which were developed at considerable effort and expense.  Fallon Decl. ¶ 27-28; Clayville Decl. ¶ 22; Banks Decl. ¶ 18; Carlton Decl. ¶ 9; Gandarillas Decl. ¶ 9; Neault Decl. ¶¶ 5-6.  The use of Amazon's confidential and proprietary information by Google would harm Amazon by allowing Google to use that information to its advantage in developing and improving its service offerings and sales strategies.  Fallon ¶ 27; Clayville ¶ 22; Banks Decl. ¶ 18; Carlton Decl. ¶ 9; Gandarillas Decl. ¶ 9.  The agreement's covenants reasonably protect Amazon's business, goodwill, confidential information, and customer relationships by placing narrow restrictions on the post-employment conduct of its senior employees.  Fallon Decl. ¶¶ 27-29; Clayville ¶ 22; Banks Decl. ¶ 18.

### 2.   The Noncompetition Agreement's Noncompetition Covenant is Reasonable.

The restrictions on Moyer's work—which bar nothing more than developing and selling products and services that compete with the services he developed and sold as an AWS executive for the term of his noncompete—are reasonable, and, as Google is well aware, regularly enforced.[8]  In *Amazon v. Szabadi*, an Amazon employee held a business development

---

[8] The only case in which a court has declined to enforce an Amazon noncompete to the full extent sought by Amazon was *Amazon.com, Inc. v. Powers*, 2012 WL 6726538 (W.D. Wash. Dec. 27, 2012), a case in which Judge Jones entered a limited injunction against a former Amazon employee who took a new position at Google.  In an effort to preserve the confidentiality of the sensitive information obtained by the defendant while at AWS, Amazon relied on declarations broadly describing the employee's work at Amazon rather than offering detailed testimony and filing confidential documents under seal.  *Id.* at *5.  Amazon learned from the experience seven years ago, and since that time has (admittedly with trepidation, given the sensitivity of the information) submitted detailed declarations backed by extensive documentary proof in support of its claims.  Additionally, to the extent

MOTION FOR PRELIMINARY INJUNCTION - 17
(2:19-cv-01176-RSM)

role in the AWS Partner Program Group in which he was responsible for developing and growing Amazon's relationship with partners who utilize and sell Amazon's cloud computing services. The former employee, Szabadi, accepted a position in Google's competing cloud computing business, and Amazon filed suit to enforce his noncompetition agreement. Judge Ramsdell ruled against the former employee (**and** Google, which had intervened in the case), and held Amazon had a right to enforce its noncompete so as to hold a former employee out of a competitive position. *See* Bugaighis Decl., Ex. O.[9]  Judge Ramsdell explained that the Amazon agreement "is intended to protect legitimate interests of Amazon and precludes Mr. Szabadi from work at Google related to its Cloud partners and resellers." *Id.*

Two years later, in *Amazon v. Farrell*, Gene Farrell, AWS's Vice President of the Enterprise Applications & EC2 Windows team, resigned in order to take a position at Smartsheet. Farrell's new role at Smartsheet involved the development of, and strategy for, Smartsheet's cloud-based productivity products. Commissioner Velategui granted Amazon's motion for temporary restraining order and expedited discovery, and held Amazon had a clear contractual right to enforce its noncompete to prevent Farrell from accepting a directly competitive position. *Id.*, Ex. P.

And just last year, in *Amazon v. Wiley*, the General Manager of Amazon SageMaker and Amazon Machine Learning accepted a position in Google's cloud machine learning business. Judge Mary Roberts awarded Amazon a temporary restraining order, explaining that "Amazon has a reasonable and well-grounded belief that Wiley intends to violate its rights by working at Google in cloud machine learning." Bugaighis Decl., Ex. Q. In both *Wiley* and *Szabadi*, the courts rejected the same arguments that are made to this court: that the jobs at Google were "different" and thus "unrelated" to the employee's work at AWS.

---

the *Powers* court had any concerns with the form of the noncompetition agreement, Moyer signed a different form of agreement. *Compare* Peku Decl., Ex. A *with Powers*, 2012 WL 6726538, at *1.

[9] The court held that noncompete provision could not hold Szabadi out of work for Google entirely, but properly restricted Szabadi from working at Google in a similar position for which he had obtained confidential and proprietary information while at Amazon.

MOTION FOR PRELIMINARY INJUNCTION - 18
(2:19-cv-01176-RSM)

The Noncompetition Agreement's 18-month restriction—a period that tracks closely with Moyer's knowledge of Amazon's cloud strategies through 2020—is reasonable and enforceable.  Fallon Decl. ¶¶ 27-29; Clayville Decl. ¶ 22; Banks Decl. ¶¶ 17-18; Carlton Decl. ¶ 9; Gandarillas Decl. ¶ 9.  Washington courts routinely uphold covenants of even greater duration, *see, e.g.*, *Moran,* 109 Wn.2d at 694-97 (three years); *Emerick v. Cardiac Study Ctr., Inc.*, 189 Wn. App. 711, 731 (2015) (five years); *Armstrong v. Taco Time Int'l, Inc.*, 30 Wn. App. 538, 545 (1981) (two and a half years), and new Washington legislation that goes into effect on January 1 provides that 18 months is a presumptively reasonable term for a noncompete.  The geographic scope is a non-issue as cloud computing is a global business, and there is no dispute that Moyer participated in its worldwide operations, including reviewing AWS's operational planning documents for geographies around the world.  Clayville Decl. ¶¶ 5-10 & Exs. A-E.  The record is also clear that Moyer can and will still be able to earn a living if he honors his contract: ███████████████████████████████████ ███████████████ *Emerick*, 189 Wn. App. at 724 (reasonableness analysis considers "the extent to which the covenant adversely affects the employee's ability to earn a living").

### 3.    No Public Policy Weighs in Favor of Excusing A Former Sales Executive From His Commitments to Amazon.

There is no policy reason Moyer's Noncompetition Agreement should not be enforced on the facts of this case.  Google is fully capable of competing with AWS—fairly, and without trading on Moyer's intimate knowledge of Amazon's cloud business.

### B.    Amazon Will Likely Suffer Irreparable Harm Without Injunctive Relief.

Irreparable injury may be presumed in cases involving breach of a noncompete because the potential loss of a company's "investment in good will and … its long-time customers ... [would be] difficult, if not impossible, to determine monetarily." *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (internal quotation marks omitted) (affirming preliminary injunction).  "[A] breach of the agreement occasions harm.  Because the harm is intangible and difficult to quantify, it qualifies as irreparable." *Ocean Beauty Seafoods,*

MOTION FOR PRELIMINARY INJUNCTION - 19
(2:19-cv-01176-RSM)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1  *LLC v. Pac. Seafood Grp.*, 648 F. App'x 709, 711 (9th Cir. 2016) (citing *Rent-A-Center, Inc. v.*

2  *Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (affirming

3  preliminary injunction; holding that "advertising efforts and goodwill that RAC sought to

4  protect … constituted possible irreparable harm")); *Basicomputer Corp. v. Scott*, 973 F.2d 507,

5  512 (6th Cir. 1992) (granting preliminary injunction; stating that "the loss of fair competition

6  that results from the breach of a non-competition covenant is likely to irreparably harm an

7  employer").

8        Irreparable harm is established in cases involving sales executives where, as here, the

9  executive's confidential knowledge could be used to divert customers or sales to a competitor

10 by shaping its strategy.  Clayville Decl. ¶ 22; Fallon Decl. ¶¶ 27-28;  *Nike, Inc. v. McCarthy*,

11 379 F.3d 576, 586 (9th Cir. 2004) (finding former employee's access to information concerning

12 "Nike's product allocation, product development and sales strategies […] strategic sales plans,

13 providing overall direction for product allocation and shaping product lines, including how

14 products are priced" could divert former employer's sales to competitor); *Harlan Labs., Inc. v.*

15 *Campbell*, 900 F. Supp. 2d 99 (D. Mass. 2012) (even if former employer's sales role was not

16 identical to his role with his current employer, "it is likely that at least a portion of the

17 information [former employee] used in his sales manager role will overlap with the information

18 needed as a marketing director" such as "sale revenue data, client contact information, sales

19 opportunities, and pricing information" and "general trends in customer preferences, pricing,

20 and sales revenue developed from access to confidential information, could usefully inform

21 someone creating new marketing strategies and catalogs for a competitor"); *Life Image, Inc. v.*

22 *Brown*, 29 Mass. L. Rptr. 427 (Super. Ct. 2016) ("Mr. Brown, who was directly involved in the

23 planning and marketing of a new product …, information about the product's benefits and

24 weaknesses, adequacy of servicing and maintenance of the product once in place, ancillary

25 product development in the future, corporate sales strategies both present and future, internal

26 organizational information such as the strengths and weaknesses of sales staff, and customers'

27

MOTION FOR PRELIMINARY INJUNCTION - 20
(2:19-cv-01176-RSM)

1  idiosyncratic wants, needs, and complaints. Mr. Brown would necessarily hold in his head or in

2  his computer insider marketing information, i.e., marketing strategy, management, and

3  concepts specific to the cloud-based product.").

4       Moyer has already shown that he is willing to use AWS's confidential plans to his own

5  personal gain and Amazon's detriment.  Moyer spent considerable time reviewing AWS's

6  ███████████████████████████████████████████████████████████

7  ████████████████████████████████████████ seven times, and

8  photographed it on April 29th, shortly before interviewing with Google on May 19th.

9  Bugaighis Decl. ¶ 5 & Ex. C; Peku Decl., Ex. C.  In fact, days before he interviewed, he

10  reviewed the OP1 document again.  *See* Stenhouse Decl., Ex. B (█████████████████

11  ████████████████████████████████████████); Bugaighis

12  Decl. ¶; Peku Decl., Ex. C.  █████████████████████████████

13  █████████████████████████████████████████████████

14  █████████████████████████████████████████████████

15  ████████████████████████████████████ *See* Banks Decl., Ex. A

16  at 28 & 2.  The OP1 also discussed in great detail ████████████████████

17  ███████████████████████████████████ *Id.* at 6-7.  In his

18  interview with Google, Moyer cited his knowledge of ██████████████████████

19  █████████████████████████████████████████████████

20  ████████████ Bugaighis Decl., Ex. I at Google 26-27.

21       Based on his counsel's "cross-examination" at deposition, it is expected that Moyer will

22  claim he "does not remember" the business strategy documents to which he contributed or the

23  meetings he attended, including the ones he reviewed days before his departure.  But Amazon

24  need not show that Moyer has memorized every detail of Amazon's trade secrets, customer lists,

25  and confidential business plans, a burden that would defeat the prophylactic purpose of fair

26  noncompetition agreements.  Rather, Moyer's ***access*** to and demonstrated use of this

27

MOTION FOR PRELIMINARY INJUNCTION - 21
(2:19-cv-01176-RSM)

information at AWS is sufficient to establish a protectable interest.  As the Washington Court of

Appeals explained in *Emerick v. Cardiac Study Center, Inc.*:

> A restrictive covenant protects an employer's business as warranted by the
> nature of employment.  An employee who joins an established business
> gains access to his employer's customers and acquires valuable information as
> to the nature and the character of the business.  This exposure to the employer's
> clients and business model allows the employee to compete with his employer
> after he leaves the employment.  To protect the employer's business, equity
> allows the employer to require the employee to sign a noncompetition
> agreement.

189 Wn. App. at 722 (citations omitted).  Similarly, in *Northwest Mobile Services, LLC v.

Schryver Medicl Sales & Marketing, Inc.*, 2006 WL 1799620, at *2 (W.D. Wash. June 28, 2006),

Judge Leighton noted "that [the former employee] did not know the intimate details of his

former employer's business does not mean that he did not have access to protectable interests,

including customer lists and relationships."  *See also Nike*, 379 F.3d at 586 (former employee

"had the highest access to confidential information concerning Nike's product allocation,

product development and sales strategies"); *U.S. Water Servs., Inc. v. Itoh*, 2011 WL 834167, at

*2 (W.D. Wash. Mar. 3, 2011) (former employee had access to "trade secrets and confidential

information"); *Minn. Mining & Mfg. Co. v. Francavilla*, 191 F. Supp. 2d 270, 275, 278 (D.

Conn. 2002) ("the defendant had access to the 3M optical fiber recipes that determine the unique

and confidential characteristics of the fibers 3M manufacturers for its customers"); *Cabot Corp.

v. King*, 790 F. Supp. 153, 157 (N.D. Ohio 1992) (former employee "had access to confidential

information regarding pricing, market position, marketing, and customer lists").

     Moyer continued to oversee, strategize, and develop strategies and roadmaps for AWS

sales and services until shortly before he left for Google.  It is inconceivable that Moyer could be

tasked with selling and strategizing on behalf of Google cloud services and not use what he

knows about AWS's sales strategies and roadmap. [10]  Fallon Decl. ¶ 28.  He cannot simply

---

[10] While unnecessary to a ruling on Amazon's motion, injunctive relief is also appropriate because Moyer will
inevitably trade on his confidential knowledge of Amazon's business in formulating strategy, and in developing and
selling products for Google Cloud.  In *Szabadi*, the court held "the doctrine of 'inevitable disclosure' is available in
the State of Washington."  *Id.*, Ex. B at ¶ 18.  Under the doctrine of "inevitable disclosure," an employer can prove a

MOTION FOR PRELIMINARY INJUNCTION - 22
(2:19-cv-01176-RSM)

divorce himself from the confidential information that he learned at AWS, and the law presumes he will not.

### C.     The Equities Tip Heavily in Favor of Amazon.

The equities in this case weigh heavily in favor of injunctive relief.  In the absence of injunctive relief, Moyer (and Google) will be free to exploit Moyer's deep knowledge of AWS's services, products in development, and strategies for its cloud business, including Moyer's knowledge of the application of cloud services to "regulated industries" that Moyer touted during his interviews.  In contrast, if injunctive relief is granted, Moyer will still be paid more than $2 million, and risks nothing more than the potential loss of some or all of a discretionary bonus and a modest delay in his ability to participate in developing and selling competitive cloud services for Google Cloud.  *Abdou v. Davita, Inc.*, 734 F. App'x 506, 507 (9th Cir. 2018) ("[Plaintiff] faces irreparable harm in the absence of an injunction. [Defendant] do not face comparable harm if one is entered; they are simply being held to the terms of the noncompetes that they signed voluntarily (and for which they were well compensated).")

As in *Nike*, Moyer is not in danger of losing his employment if the Noncompetition Agreement is enforced.  Enslin Dep., 146:25-147:6; 148:11-12.  If Moyer is not able to act as the VP of Healthcare at Google Could for a period of time, Google will "[a]bsolutely" find him another position that does not violate the Noncompetition Agreement.  *Id.*[11]  Google claims to have hired Moyer because of good general management skills, and Moyer can work on sales of virtually any other Google product except for cloud services that he developed and sold for AWS—such as devices made by Google (including Google Home), Chrome, Translate, Search,

---

threat of misappropriation sufficient to enjoin a former employee from working for a competitor by demonstrating the employee's new employment "will inevitably lead him to rely on the [previous employer's] trade secrets."  *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (affirming preliminary injunction); *Verizon Commc'ns Inc. v. Pizzirani*, 462 F. Supp. 2d 648, 658 (E.D. Pa. 2006); *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 634 (E.D.N.Y. 1996); *Marcam Corp. v. Orchard*, 885 F. Supp. 294, 297 (D. Mass. 1995); *Bus. Intelligence Servs., Inc. v. Hudson*, 580 F. Supp. 1068, 1072 (S.D.N.Y. 1984).

[11]Although there has apparently been discussion about other positions for which Mr. Moyer is well suited, Google claimed that those discussions were privileged, and its counsel instructed its witness not to answer questions on the subject.  Enslin Dep., 144-45.

MOTION FOR PRELIMINARY INJUNCTION - 23
(2:19-cv-01176-RSM)

Google documents, Pixel 3, Gmail, and YouTube—all without implicating the confidential and proprietary information he knows from his former position at Amazon.  Fallon Decl. ¶ 29. Honoring his contract with Amazon will be an inconvenience for Moyer, but not a hardship. Enslin Dep., 169:15-170:7 ███████████████████████████████████████████████ ██████████████████████████.

### D.      The Public Has No Interest in Relieving Moyer from His Promises to Amazon.

The public's interest in fair competition and protecting legitimate business interests favors granting Amazon the injunctive relief it seeks here.  *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 263 (1994) (the legislature "recognizes that protection of trade secrets … promotes business activity and prevents unfair competition"); *Verizon*, 462 F. Supp. 2d at 662 ( "non-competition covenants … serve an important public-policy function…."); *Bowe Bell & Howell Co. v. Harris*, 145 F. App'x 401, 404 (4th Cir. 2005) ("the public has an interest in enforcing restrictive covenants that protect business interests"); *see also Bad Ass Coffee Co. of Haw., Inc.* v. *JH Nterprises, LLC,* 636 F. Supp. 2d 1237, 1252 (D. Utah 2009) (where defendants breached non-compete their "harms [are] self-inflicted and are not properly considered as harms to the 'public interest'").

### E.      The Court Should Not Order Amazon to Post Substantial Security.

Moyer voluntarily delayed competitive, substantive work at Google through the date set for the hearing on this motion, September 12, 2019.   Bugaighis Decl. ¶ 17.  The requested injunction does not stop Moyer from working for Google on sales of virtually any other Google product; only from working in one specific, competitive area.  Moyer agreed in the Noncompetition Agreement that an injunction could be entered without the posting of any security.  Peku Decl. ¶ 4, Ex. A ¶ 7.4.  Beyond that, there is no evidence that Moyer will not be compensated in full by Google.  In the event the Court requires security for the requested restraining order, it should be modest.  *See e.g.*, *Life Time Fitness, Inc. v. DeCelles*, 854 F. Supp. 2d 690, 697 (D. Minn. 2012) (requiring bond of $5,000 in non-compete case).

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

1     DATED this 23rd day of August, 2019.

2                          Davis Wright Tremaine LLP
Attorneys for Plaintiff Amazon.com, Inc.

3

By *s/ Zana Bugaighis*

4                            Brad Fisher, WSBA #19895
Zana Bugaighis, WSBA #43614

5                            Jordan Clark, WSBA # 49659

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

MOTION FOR PRELIMINARY INJUNCTION - 25
(2:19-cv-01176-RSM)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA  98104-1610
206.622.3150 main · 206.757.7700 fax

**CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to those attorneys of record registered on the CM/ECF system. All other parties (if any) shall be served in accordance with the Federal Rules of Civil Procedure

Dated this 26th date of August, 2019.

*s/ Zana Bugaighis*
Zana Bugaighis, WSBA #43614

CERTIFICATE OF SERVICE – 1
(2:19-cv-01176-RSM)

Davis Wright Tremaine LLP
LAW OFFICES
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1610
206.622.3150 main · 206.757.7700 fax