The Honorable Ricardo S. Martinez

1

2

3

4                   IN THE UNITED STATES DISTRICT COURT

5                   WESTERN DISTRICT OF WASHINGTON

6                                AT SEATTLE

7
     AMAZON.COM, INC.,                          Case No. 2:19-cv-1176-RSM
8
                         Plaintiff,
9
            v.                                  **DEFENDANT PHILIP MOYER'S**
10                                              **RESPONSE TO AMAZON'S MOTION**
     PHILIP MOYER,                              **FOR PRELIMINARY INJUNCTION**
11
                         Defendant.             Oral Argument Requested
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................1

FACTS ................................................................................................................1

    I.     Amazon recruited Moyer to be Director of Global Financial Services, U.S. because he is a seasoned veteran of IT sales with a record of success. ...................1

    II.    Google recruited Moyer based on his more than 25 years of experience and hired him for a role that will not require him, or even allow him, to use Amazon's confidential information or unfairly compete with Amazon............2

    III.   In preparing to leave AWS, Moyer took reasonable steps to ensure that he no longer possessed AWS information and that AWS would not have access to his information.........................................................................3

    IV.   Amazon has refused to engage in meaningful discussion regarding possible roles that Moyer could fill in Google cloud...............................4

LEGAL STANDARD ..........................................................................................5

DISCUSSION ....................................................................................................5

    I.     Amazon is not likely to succeed on the merits. .......................................5

         A.    The Agreement is an overly broad restraint on Moyer's post-Amazon employment that must be reformed.................................6

         B.    Nothing that Moyer worked on or was exposed to selling to financial services customers at AWS would prevent him from fairly competing against AWS by selling to an entirely different industry vertical at Google..........................................................9

             1.    The financial services industry and the healthcare industry have materially different cloud computing needs..........................9

             2.    Both Amazon and Google market cloud services to different industries using different techniques and different sales teams. .................................................................10

             3.    Moyer's work at AWS was primarily focused on financial services customers—not healthcare..............................10

         C.    Moyer's ancillary exposure to "cross-vertical" information should not prevent him from selling to a different set of customers. ...................12

             1.    Moyer's work on AWS's ▇▇▇▇▇ and resiliency narrative would not provide Moyer any unfair competitive advantage in selling GCP to healthcare customers. .....................13

             2.    Moyer's mere access to AWS confidential documents is insufficient to bar him from the entire cloud computing industry. .................................................................14

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

3.      Moyer's involvement in the remaining yet-to-be announced projects was limited and would not provide Moyer any unfair competitive advantage in selling GCP to healthcare customers. ...................................................................................17

II.     Amazon has not shown that it is likely to suffer irreparable harm in the absence of preliminary relief ..............................................................................18

A.      Moyer can easily perform his job at Google without using or disclosing AWS confidential information. ................................21

B.      Moyer has demonstrated his ability to protect AWS confidential information during his interview process and preliminary engagement with Google. .........................................................22

C.      Amazon has made previous erroneous claims that AWS sales executives cannot work for Google Cloud without using AWS confidential information...........................................................23

III.    The balance of equities and public policy favor Moyer ......................................24

CONCLUSION....................................................................................................................24

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

# INTRODUCTION

Philip Moyer is an IT executive with over 25 years of experience in the industry, including over 14 years in cloud computing. When leaving Amazon Web Services ("AWS") for Google, Moyer and Google found a role in which Moyer could use his extensive experience in IT sales and management while still respecting his noncompete and non-disclosure agreement with Amazon. In his planned role at Google as Vice President of Healthcare, Moyer will not work with any of the same customers, or even with customers in the same industry (financial services) as he worked with at AWS. He will not have input on the product roadmap beyond passing along customer requests. And, as with all Google employees, he will be free to recuse himself from any meeting or situation that calls for him to possibly use or reveal AWS confidential information.

These reasonable limitations did not satisfy Amazon. Rather, Amazon has demanded that Moyer be kept from all cloud sales for the period of his noncompete. This district court—on a nearly identical fact pattern involving a more senior sales executive moving from AWS to Google—has already decided that such sweeping prohibitions are inappropriate under Washington law. *Amazon.com, Inc. v. Powers*, No. C12-1911RAJ, 2012 WL 6726538, at *10 (W.D. Wash. Dec. 27, 2012). The same result is warranted here.

Amazon has already used this litigation to keep Moyer from working in any meaningful way for four months. The Court should deny the preliminary injunction and permit Moyer to return to his career.

# FACTS

## I. Amazon recruited Moyer to be Director of Global Financial Services, U.S. because he is a seasoned veteran of IT sales with a record of success.

Moyer started his career in technology sales at Microsoft where he worked his way up over fifteen years from a pre-sales engineer to the general manager of enterprise technologies and services. Declaration of Philip Moyer ("Moyer Decl.") ¶ 2. Since that time Moyer has held a variety of executive roles across the cloud computing and financial services technology field.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

In early 2017, given Moyer's extensive background in technology sales in the financial services space, AWS recruited Moyer to be the Managing Director of Global Financial Services, United States. Moyer Decl. ¶ 6. In 2017, this was a new role as AWS was getting its Financial Services Industry Business Unit up and running at that time. Ex. 3 (excerpts of Tr. of Dep. of Frank Fallon) ("Fallon Dep.") 39:9-40:7. Moyer received and signed his offer letter with AWS on March 1. Ex. 5.[1]

In his two years at Amazon, Moyer focused exclusively on selling AWS services to a small subset of very large financial services customers. The Financial Services Business Unit has its own sales team, business development team, marketing team, and partners team due to the unique needs of financial services customers. Fallon Dep. 50:13-51:12. Moyer was specifically responsible for AWS Global Financial Services customers based in the United States—a set of ▮ systemically important financial institutions (SIFIs) and systemically important financial market utilities (SIFMUs). Fallon Dep. 19:4-20:4, 81:14-83:17. All of Moyer's revenue-generating responsibilities and all of the responsibilities listed in Moyer's job description related specifically to working with these ▮ customers. Fallon Dep. 82:17-83:11, 89:20-98:3.

None of the customers Moyer had direct responsibility for were in the healthcare industry. Fallon Dep. 16:25-17:25; Ex. 1 (excerpts of Tr. of Dep. of Mike Clayville) ("Clayville Dep.") 57:12-58:20. And no one in Moyer's chain of command worked directly with healthcare or life sciences customers. Fallon Dep. 86:1-87:2.

II. **Google recruited Moyer based on his more than 25 years of experience and hired him for a role that will not require him, or even allow him, to use Amazon's confidential information or unfairly compete with Amazon.**

Google Cloud began restructuring around six particular industry verticals in January 2019 Ex. 2 (excerpts of Tr. of Dep. of Rob Enslin) ("Enslin Dep.") 22:22-23:11, 23:24-24:17. Well before anyone at Google spoke with Moyer about joining the company, Google had already hired

---

[1] Unless otherwise indicated, all Exhibit ("Ex.") references refer to Exhibits to the Declaration of Tyler Francis ("Francis Decl.").

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Bob Allison—who ran the financial services vertical at Oracle for years—to run Financial Services for Google Cloud, and the company at no time had any intention of putting Moyer in this position. Enslin Dep. 24:18-25:4, 26:19-25.[2]

Moyer decided to leave AWS early in 2019. Moyer Decl. ¶ 59. In April he was in negotiations to become the CEO of ACA Compliance. Moyer Decl. at ¶ 60. As part of that process, he reached out to his former colleague Kirsten Kliphouse for a recommendation. *Id.* Kliphouse encouraged Moyer to consider Google instead. Although he was hesitant, Moyer agreed to have a conversation with Rob Enslin and ultimately to interview with Google. Moyer Decl. ¶ 61.

Enslin recruited and hired Moyer to lead the healthcare vertical in order to acquire a strong general manager who was highly recommended by Kirsten Kliphouse, his former Microsoft colleague. Enslin Dep. 21:9-22:6. In addition, Moyer's proximity to the pharmaceutical industry presence on the Route 202 corridor between Philadelphia and Manhattan was a factor in Enslin's decision as well. Enslin Dep. 35:1-35:21. Google offered Moyer a salary designed to be competitive with his offer from ACA Compliance. Enslin Dep. 35:22-36:12.

**III.** **In preparing to leave AWS, Moyer took reasonable steps to ensure that he no longer possessed AWS information and that AWS would not have access to his information.**

Because Moyer knew he was leaving as early as April 2019 (although he believed it was for a different position), in the end of April Moyer began to clean up documents on his company laptop and his personal devices. Moyer reviewed his devices, including personal emails, for Amazon information and deleted the information as he found it. Moyer Decl. ¶ 68. At that time, Moyer had no indication that litigation would ensue, and believed he was ethically carrying out his duty to Amazon to ensure that upon separation he did not maintain Amazon's information in

---

[2] Indeed, Google does not intend to place Moyer in charge of financial services even after the expiration of his noncompete. Enslin Dep. 54:15-55:21.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

his possession.[3] Moyer Decl. ¶ 69.

Moyer also took reasonable steps to ensure that Amazon would not have access to his personal information that had accumulated on his work laptop. Amazon's insinuation that Moyer "knowingly destroyed" evidence in order to hide "the scope of his work for Amazon" from the company is false and insulting. Like many Amazon employees, Moyer's laptop contained a combination of work materials and personal information. Ex. 4 (excerpts of Tr. of Dep. of Philip Moyer) ("Moyer Dep.") 130:9-132:2; Moyer Decl. ¶ 65. Accordingly, and in accordance with what Moyer viewed to be common practice for departing employees, Moyer wiped the laptop's hard drive. Moyer Dep. 133:17-25.[4] This action does not appear to have prejudiced Amazon's ability to assemble detailed logs and spreadsheets documenting what Moyer had access to during his time with the company.

## IV. Amazon has refused to engage in meaningful discussion regarding possible roles that Moyer could fill in Google cloud.

From the beginning of the process, Google has respected Moyer's noncompete agreement. Because the job description for VP Healthcare has him working with a different customer set than he previously worked with and because his role does allow meaningful input on the product roadmap for Google, Google believes it is honoring the scope of the noncompete agreement to its enforceable limits. Declaration of Jennifer Blackstone ("Blackstone Decl.") ¶ 3. Despite believing that the role itself is sufficiently distinct from what Moyer did at AWS, Google still communicated with Amazon counsel for several months to understand their concerns and to

---

[3] As litigation became reasonably anticipated, Moyer stopped deleting Amazon information as he came across it on his personal devices. In this litigation, Moyer produced the limited information still in his possession that he found in his iPhoto library and his sent email folders which he had previously forgotten to look in when purging Amazon's information. Moyer Decl. ¶ 71. Moyer would like to destroy this information but has been told by Amazon counsel that he cannot. Ex. 6.

[4] Amazon gamely asserts that Moyer knew that the company intended to run forensics on the machine based on Moyer's previous experience with Brad Spivack, one of his direct reports who departed to Oracle. Mot. at 15; Declaration of Zana Bugaighis (ECF No. 38) ("Bugaighis Decl.") ¶ 16. Amazon is half-right: Moyer indeed recalled the procedure surrounding Spivack's departure—specifically, the fact that Spivack had also wiped his computer before departing without comment or complaint from Amazon. Moyer Decl. ¶ 72. Several other of Moyer's direct reports also deleted the contents of their laptops before turning them in. Moyer never found this odd as it was his understanding of standard practice. And, notably, AWS never raised a concern with him about it. Moyer Decl. ¶ 73.

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 4

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

try to address them. To allow for appropriate discussions, Google pushed back Moyer's start date several times and has agreed to keep him from any meaningful work until the resolution of this preliminary injunction hearing.[5] In response to every overture from Google, Amazon simply demanded that Moyer be removed from all cloud sales, either directly or indirectly. Amazon refused to consider the natural limitations on the position or additional specific limitations directed at addressing its concerns. Blackstone Decl. ¶ 7.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Precisely because it is such a drastic and extraordinary remedy, it "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Schnitzer Steel Indus., Inc. v. Sessler*, 2017 WL 7789718, at *1 (E.D. Wash. May 26, 2017) (emphasis in original) (quoting *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012)).

A party seeking a preliminary injunction must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018), citing *Winter*, 555 U.S. at 20.

## DISCUSSION

### I.   Amazon is not likely to succeed on the merits.

Under Washington law, a Court considering the reasonableness of a noncompetition agreement must consider three factors:

> (1) whether restraint is necessary for the protection of the business or goodwill of the employer, (2) whether it imposes upon the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill, and (3) whether the degree of injury to the public is such loss of the service and skill of the employee as to warrant nonenforcement of the covenant.

---

[5] As Moyer described at Deposition, although he is already "working" for Google his position has been limited to a learning only role. Moyer Dep. 194:9-196:14. In fact, he cautiously even lets trainers know that he is under restrictions so he cannot actively participate in trainings but can only listen. Moyer Dep. 170:12-171:17.

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 5

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Perry v. Moran*, 748 P.2d 224, 228 (Wash. 1987). Only where such an agreement is "reasonable in light of the interests of the employer, the employee, and the general public," will Washington courts enforce a covenant not to compete. *Labor Ready, Inc. v. Abis*, 767 A.2d 936, 942 (Md. Ct. Spec. App. 2001) (applying Washington law).

While Washington courts have generally upheld agreements prohibiting a former employee from working with an employer's clients or customers, they have been more skeptical of restraints like this one, which prohibit former employees from assuming any competitive employment. Washington courts agree that while employers "can take measures to protect legitimate business interests," they "may not unreasonably restrict the freedom of current or former employees to earn a living." *Labriola*, 100 P.3d at 800 (Madsen, J. concurring). *See also Elec. Evidence Discovery, Inc. v. Chepalis*, No. C07-1929RSL, 2007 WL 4376194, at *3 (W.D. Wash. Dec. 13, 2007) (declining to issue temporary restraining order to enforce a noncompetition agreement that precluded former employee from working in the employment field in which she worked for 24 years).

### A. The Agreement is an overly broad restraint on Moyer's post-Amazon employment that must be reformed.

The Agreement contains a broad noncompetition clause. Compl. (ECF No. 1-1) Ex. A ("Agreement") ¶ 4.1. Such general restrictions on competition, unbounded by geography and not tied to a specific set of clients or customers, are entitled to less deference, and can only be justified by a specific showing that such restrictions are necessary in order to prevent *unfair* competition. *See Genex Co-op, Inc. v. Contreras*, 2014 WL 4959404, at *7 (E.D. Wash. Oct. 3, 2014); *ChemStation of Seattle, LLC v. Donahoe*, No. 77030-6-I 2018 WL 3625781, at *5 (Wash. Ct. App. Jul. 30, 2018).

Amazon's Complaint—and indeed, the Agreement as written—would effectively bar Moyer from the entire cloud computing industry, anywhere in the world. By its own terms, it is a ban not simply on *unfair* competition, but on *all* competition, effectively eliminating all AWS

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1    sales employees from the leading business sector in IT.[6] Such a prohibition, if enforced, would

2    prevent Moyer from working in nearly every position for which he is qualified to work. Ex. 7.

3    By prohibiting Moyer from "gaining lawful post-termination employment in such broad

4    sweeping terms," the agreement represents nothing less than Amazon's "unfair attempt . . . to

5    secure its business against legitimate competition." *Labriola*, 100 P.3d at 800 (Madsen, J.,

6    concurring). "Postemployment restraints of this nature are never reasonable." *Id*.

7        Perhaps as a result of the Agreement's overbreadth, even Amazon itself does not behave

8    as if the Agreement means what it actually says. Amazon does not enforce the Agreement

9    against every AWS employee that departs to work for a competitor, and generally seeks to

10   negotiate a far narrower set of restrictions from those that actually appear in the Agreement

11   itself. Amazon's practice of permitting its sales employees to work for competitors, provided that

12   they do not call on the same customers is not only common knowledge within the company,

13   Moyer Dep. 23:10-24:2, 24:12-25, 87:12-16, but also conveyed to new employees—*including

14   Moyer*—prior to signing the Agreement. Moyer Dep. 21:24-22:2, 87:1-10; Ex. 8.

15       Indeed, Amazon gave no indication that it believed the Agreement would prevent Moyer

16   from accepting a position as the CEO of ACA Compliance, Moyer Dep. 82:6-10, despite the fact

17   that in that role, Moyer would have a far greater likelihood of drawing on his knowledge

18   acquired from selling AWS services to his financial services customers.

19       Amazon appears to acknowledge that the Agreement as written and the relief requested in

20   the Complaint is overbroad. Amazon's Complaint does not simply seek to bar Moyer from

21   becoming VP of healthcare, but instead seeks an injunction truly staggering in scope: to bar him

22

23   ───────────────

[6] While the Agreement's non-competition provisions appear limited to "product[s] or service[s] . . . that [an]
24   Employee worked on or supported, or about which Employee obtained or received Confidential Information,"
     Agreement ¶ 4.1, Amazon's definition of "product or service" in this case renders this limitation meaningless.
25   Amazon characterizes AWS as a "one to many" company that creates and sells a single set of products and services
     (albeit in different ways to different types of customers). Declaration of Frank Fallon (ECF No. 24) ("Fallon Decl.")
     ¶ 9. By this logic, *all* of Amazon's sales employees necessarily "work on or support" the same "full menu of cloud
26   products and services" that Amazon provides for all customers. Fallon Decl. ¶¶ 9-10. Amazon's form Agreement,
     which all AWS sales employees generally sign, Blackstone Decl. ¶ 2, therefore purports to bar all of its sales
     employees from the *entire* cloud computing field for 18 months, regardless of the true scope of their work for AWS.

27

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

from cloud sales *entirely* for a year and a half. Such an injunction, not simply limited to the customers or industries he worked on, but rather a worldwide ban on Moyer competing with AWS in any capacity, is remarkably similar to the injunction the court denied in *Powers*, a case which involved an even higher-level[7] AWS cloud sales executive who departed to work for Google Cloud. The court reasoned that Amazon was attempting to enforce a ban not on *unfair* competition but on *all* competition, and that the company could not "eliminate skilled employees from future competition by the simple expedient of hiring them." *Powers*, 2012 WL 6726538, at *10.

Amazon tries to avoid the result seemingly required by *Powers* by seeking an injunction that is narrower than the relief sought by their Complaint, seeking the benefit of the sweeping injunction sought by its Complaint without having to do the work to actually prove why it is entitled to it. Worse, it attempts to mislead the Court into thinking that Moyer somehow *agreed* to this. Mot. at 5 n.5.

In reality, Amazon sent a letter to defense counsel on August 2, 2019, advising that despite the breadth of the relief sought in the Complaint, Amazon intended to seek a preliminary injunction that only barred Moyer from filling the Vice President of Healthcare position for which he was hired. Ex. 10. Amazon further explained that it had objected to Moyer's position with Google in large part due to Amazon's belief that "'healthcare' is a highly regulated industry, much like financial services." *Id.*

Defense counsel responded by reminding Amazon that Google had made numerous, unsuccessful attempts to address Amazon's stated concerns by proposing additional limitations[8] on Moyer's role as Vice President of Healthcare and even other roles for Moyer in cloud sales.

---

[7] Powers was the Vice-President of Sales for AWS, and had sales duties now carried out by Mike Clayville, Moyer's skip-level manager. Ex. 9 (Powers Decl.) ¶ 9; Clayville Dep. 13:7-13:13.

[8] Google and Moyer's intention was always to develop restrictions that would screen Moyer from financial services. Enslin Dep. 121:9-122:12. Indeed, the reason Google has not yet documented a detailed set of restrictions is that Amazon would not agree to *any* set of restrictions other than barring Moyer from the cloud computing industry entirely, and threatened to move forward with a TRO unless Google temporarily agreed that Moyer would have no role in cloud sales. *See also* Enslin Dep. 167:4-9, 135:3-16 (noting that while there are no restrictions currently documented because there's no agreement in place to create them, Google intends to create "very clear documentation in what Moyer can do or—or cannot do").

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Defense counsel expressed concern with Amazon's shifting demands, given that the Complaint sought to bar Moyer from working for Google Cloud not simply in the healthcare-limited role he was hired for, or even in positions related to "highly regulated industries," but instead sought to preclude him from "engaging in any activities that directly or indirectly support any aspect of Google cloud." Accordingly, defense counsel requested that Amazon amend its Complaint to bring it in line with the apparently narrower scope of relief that Amazon intended to seek (and, indeed, now seeks) from this Court. Ex. 1.

What Moyer did not do was "assure" Amazon that it need only succeed in obtaining a narrower preliminary injunction in order for Moyer to voluntarily abide by the broader injunction sought by Amazon's Complaint. If Amazon believes it is entitled to bar a 25-year IT veteran from the entire cloud computing industry altogether, it must actually move for (and be prepared to defend) such sweeping relief.

Put simply, the Agreement is facially overbroad, and Amazon knows it. It tells its new employees as much as an inducement to sign the Agreement in the first place, and it routinely negotiates terms with its former employees and their new employers rather than attempting to enforce the Agreement as written.[9]

### B. Nothing that Moyer worked on or was exposed to selling to financial services customers at AWS would prevent him from fairly competing against AWS by selling to an entirely different industry vertical at Google.

#### 1. The financial services industry and the healthcare industry have materially different cloud computing needs.

Because AWS characterizes itself as a "one to many" company that creates and sells a single set of products and services to all of its customers, Fallon Decl. ¶ 9, it repeatedly claims that the confidential information Moyer learned selling AWS to the financial services industry is directly transferrable to other industries and particularly to other "regulated industries" such as

---

[9] Of course, Amazon could easily draft a more narrowly-tailored non-compete clause, but has little reason to do so until new Washington legislation takes effect on January 1. When presented with an overly-broad non-compete, Washington courts will typically rewrite the clause to be more narrow and then enforce the modified, "reasonable" version. And in situations where its former employees are disinclined to risk litigation, Amazon maintains an obvious advantage in its negotiating position with these former employees and their new prospective employers.

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 9

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

healthcare.[10]

But the systems and workflows utilized by the financial services industry are dramatically different than the those utilized by healthcare companies. Ex. 14. Each industry is also supported by an entirely different ecosystem of Independent Software Vendors ("ISVs") with whom cloud vendors must partner and develop deep relationships in order to sell to a given industry. *Id.*; Fallon Dep. 58:24-62:22. And each industry is subject not only to different substantive regulations, but to entirely different regulators in different parts of the government. Ex. 14; Fallon Dep. 83:20-85:8; Enslin Dep. 78:3-79:8, 108:3-110:19.

### 2. Both Amazon and Google market cloud services to different industries using different techniques and different sales teams.

Because the financial services industry and the healthcare industry have such dramatically different requirements, AWS uses different approaches to sell to each industry. Amazon creates entirely separate sets of marketing material for each industry, *see* https://aws.amazon.com/industries/, highlighting the different benefits, use cases, case studies, whitepapers, compliance requirements, and partners for each industry. *Compare* https://aws.amazon.com/health/ *with* https://aws.amazon.com/financial-services/. Accordingly, AWS segments its cloud sales teams into separate industry "verticals." Mot. at 6; Declaration of Mike Clayville (ECF No. 22) ("Clayville Decl.") ¶ 4.

Google Cloud Sales is organized in a similar fashion, separating financial services and healthcare into their own separate industry vertical organizations (along with other industries such as retail and manufacturing) rather than grouping them together into a single "regulated industries" team. Enslin Dep. 32:10-20.

### 3. Moyer's work at AWS was primarily focused on financial services customers—not healthcare.

Moyer was a member of the Financial Services Industry Business Unit, which services

---

[10] Interestingly, the individual at the highest levels of the sales structure for AWS does not know all of the services AWS offers. Mike Clayville stridently testified that AWS does not sell gaming technology despite "game tech" being prominently featured as a category of services offered by AWS on its website and having been discussed in its own session at 2019 OP2. Compare Clayville Dep. 24:18-27:9 with Ex. 12 (screenshot of AWS services) and Ex. 13 at 4 (Agenda for OP2 2019 discussing game tech).

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

the unique needs of customers in this industry. Fallon Dep. 39:15-42:3, 41:10-43:7. By contrast, Moyer did not sell to healthcare customers, did not have direct conversations with or collect feedback from healthcare customers, and was not exposed to the AWS messaging, partnerships, or marketing that was used with healthcare customers. Moyer Dep. 72:12-73:12, 74:9-75:9. Moyer's manager confirmed that the AWS financial services group's business plan does not discuss any healthcare or life sciences customers and that he could not think of a single non-financial services customer that Moyer ever spoke to. Fallon Dep. 43:13-21, 141:24-142:10.[11] Mike Clayville similarly confirmed that he could not think of a single healthcare customer that Moyer ever would have interacted with outside of a public "one to many" event such as AWS's re:Invent. Clayville Dep. 63:19-64:8.

As a result, upon learning that Moyer had accepted a position to run Google Cloud's healthcare vertical, Moyer's manager and senior AWS leadership reacted with *surprise*, questioning whether Moyer had the requisite experience for the position, and even musing conspiratorially about whether Moyer would actually be taking on the VP healthcare role at all. Ex. 15. This reaction is deeply telling and (to put it mildly) completely inconsistent with AWS's current litigation position that Moyer's experience in financial services is directly transferrable to a new position selling to the healthcare industry.

Given the very limited evidence of Moyer interacting with his healthcare colleagues and the explicit acknowledgement that he never privately spoke to any healthcare customers, AWS points to knowledge Moyer had about his financial services customers and claims that this knowledge is also relevant in selling to healthcare customers. For example, AWS points to Moyer's knowledge of its pricing and negotiating strategy. As an initial point, while certain discounts and other terms are confidential, AWS's standard pricing model is public. Fallon Dep.

---

[11] In an attempt to walk back this testimony, Fallon now points to a single email to support the idea that Moyer collaborated with his healthcare colleagues regarding product features and other matters. In truth, that single email reveals how little Moyer knew about AWS's healthcare customers—he could not readily think of an example of a healthcare customer with needs similar to his financial services customer and had to seek input from others about who might be analogous (and at first he emailed the wrong people and the email had to be re-forwarded). Fallon Decl. Ex. B.

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

133:23-25. But more importantly, Moyer (and even Fallon) had very little visibility into AWS's pricing decisions. ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ Fallon Dep. 130:4-133:6. The additional terms required for Moyer's customers were driven by industry regulations (clearly not an AWS secret) and were part of a Financial Services Addendum that was drafted by AWS's legal department. Moyer Decl. ¶ 36. At his deposition, Clayville claimed that the "addendum" was for regulated services more broadly, but he could not say that Moyer knew that the addendum was ever used outside of financial services. Clayville Dep. 78:23-82:11.

AWS also points to Moyer's work on ████████████████████████████ ███████████████████████ But the evidence of Moyer's knowledge of ██████ outside of the financial services industry is thin. ████████████████████████████████ ████████. Fallon Dep. 134:1-140:17. And while Moyer saw them for his own customers, there is no evidence he accessed them more broadly. AWS points to a single instance where one of Moyer's subordinates discussed a ██████ from a healthcare company that financial services customers had as well. Gandarillis Dec. ¶ 7. There is no evidence Moyer saw ████████████ ████████████████████████████████████ let alone memorized it. ClayvilIle Dep. 106:22-108-2. AWS also points to a single meeting (nine months ago) Moyer attended of the ████████ ████████████████████████████████████████████████ ██████—in support of its claim he was an active member of this team. Carlton Decl. ¶ 7; Moyer Decl. ¶ 33. There is no question that Moyer was motivated to make AWS a better product for his customers, but there is little evidence that Moyer had any significant knowledge about what AWS was doing with regard to other customers.

### C. Moyer's ancillary exposure to "cross-vertical" information should not prevent him from selling to a different set of customers.

The picture AWS paints of Moyer's work is far broader than reality supports. Moyer's

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

responsibilities and exposure outside of the financial services vertical was limited. Moyer was deeply involved in only two cross-vertical initiatives, one very early in his tenue at AWS and the other which was ultimately made public. In addition, AWS has exaggerated the import of Moyer's "exposure" to various documents and his role in a series of yet-to-be-released features. As discussed below, none of these categories of information would provide Moyer with a competitive advantage in selling GCP in an entirely different industry.

        **1.**      **Moyer's work on AWS's ███████ and resiliency narrative would not provide Moyer any unfair competitive advantage in selling GCP to healthcare customers.**

Contrary to Amazon's suggestion that Moyer was "involved in" or "lead" every initiative he ever read a document about, there are in fact only two initiatives in which Moyer took on a meaningful role outside of the ██ customers he was responsible for: (1) AWS's ███████ ███████ and (2) AWS's understanding of the resiliency needs of financial services customers. Neither of these projects warrant keeping Moyer from working for a competitor, selling in a different industry.

*Moyer's work on the* ███████. Contrary to AWS's claim, Moyer's involvement in the ███████ lasted six months—not two years—and ended in March 2018. Ex. 16 at 1. Furthermore, Moyer did not select the "must-win" ███████, they were provided to him. *Id.* at 4. Following the presentation of that document over 18 months ago, Moyer's only involvement in ███████ has been to provide information about *financial services* ██. Moyer Dep. 147:8-148:3; Moyer Decl. ¶¶ 25, 26.

*Resiliency.* Resiliency is the ability to provide and maintain an acceptable level of service in the face of faults and challenges to normal operation. For the financial services industry resiliency is particularly important. Ex. 17. Moyer worked extensively on AWS's resiliency narrative, but all of Moyer's work around resiliency has been public since April.[12] Exs. 17-18. Moyer's manager confirmed that the only piece of Moyer's work around resiliency that was not

---

[12] *See* https://d1.awsstatic.com/Industries/Financial%20Services/Overview/Resilient%20Applications%20on%20AWS%20for%20Financial%20Services.pdf.

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 13

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

publicly available deals with a single issue that AWS itself has not even decided how to address. Fallon Dep. 114:19-115:2

### 2. Moyer's mere access to AWS confidential documents is insufficient to bar him from the entire cloud computing industry.

Amazon's argument that Moyer should be barred from competition merely because he had access to confidential information was explicitly rejected in *Powers* and this Court should reject it as well. Amazon attempts to sidestep the fundamental holding of *Powers* by simply providing the Court with the documents that it previously chose just to describe. That does not cut it. Just as the Court found in *Powers*, there is a critical difference between what Moyer had "access to" or was "exposed to" during his time at AWS, and what he actually remembers and could use to competitively disadvantage AWS.

During his deposition, Moyer was presented with a 17-page, 502-line spreadsheet listing the various actions Moyer took regarding documents in Amazon's secure "WorkDocs" database.[13] Ex. 19. Of the documents listed on this spreadsheet, all but 67 are clearly related to financial services, or are public.[14]

In response to extensive questioning, Moyer testified that he did not have an independent recollection of having read or accessed each of the documents on the list and could not have created the list himself from memory. Moyer Dep. 211:12-212:5. While Moyer freely volunteered when he did have specific recollection regarding a given document, *see* Moyer Dep. 122:24-123:5, Moyer did not commit these documents to memory and does not today remember the specific details (or even general concepts) from documents he accessed at one point or another during his employment at AWS. Moyer Dep. 212:25-213:7; Moyer Decl. ¶ 38.

Of the 67 documents on the WorkDocs log that are not focused on financial services, 31 of them are OP1 or OP2 documents Moyer accessed during AWS's Worldwide Commercial

---

[13] Moyer testified that he did not have any greater level of engagement with a document that was "downloaded" as opposed to simply "viewed," and that this distinction had more to do with the particular link that one clicked in order to read the document. Moyer Dep. 120:5-16, 213:8-214:10.

[14] AWS's WorkDocs log shows that on average, 336 days have passed since Moyer viewed each of these 67 non-financial services documents.

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Sector Extended Leadership Team meetings (in June 2018 and December 2018) planning for 2019. Moyer Decl. ¶ 41. Moyer did not, however, see any final OP 2020 documents and did not participate in the OP1 meetings held in the summer of 2019 to discuss and set plans for AWS's various sales units in 2020. Clayville Dep. 157:19-158:21; Moyer Decl. ¶ 45. Thus, anything Moyer knew of AWS's plans for products, marketing, or sales strategies became stale and competitively unreliable as soon as the 2020 meetings took place, given that Amazon's plans often change significantly at those meetings. Moyer Decl. ¶ 45. *See* Ex. 9 (Powers Decl.) ¶ 15.

While Moyer worked on some early drafts of the financial services documents that would be presented at the OP1 meetings this past summer, his exposure to anything outside of financial services was limited to reviewing an early draft of a single document in April, the 2020 OP1 ██████████████████. Declaration of Dori Peku ("Peku Decl.") Ex. C (ECF No. 31); Moyer Decl. ¶¶ 46, 47. Amazon attempts to inflate the importance of this 40-page, single-spaced document—that Moyer testified he had no memory of [15]—by misrepresenting the amount of interaction Moyer had to the document. Contrary to AWS's claims, the evidence is clear that Moyer viewed this document only during the one-hour meeting at which it was discussed on April 23. Ex. 20 (showing that Moyer viewed the OP1 document at 10:36:22 on April 23 and then downloaded it at 10:47:18 and 10:47:22—all actions within 10 minutes of each other). And the notion that he "reviewed" it on May 15 is simply false. The laptop log shows: (1) he downloaded it at 8:47pm on April 23 (consistent with the worklogs document) and (2) he did something to it (likely deleted or moved) at 6:50pm on May 15. That same minute, Moyer also did something with 17 other documents, all from his desktop folder.[16]

The other set of documents AWS focuses on to claim that Moyer has confidential AWS information are the weekly Top 100 Deals sheets. Moyer attended weekly calls about these documents, with 30-40 other people, about half the time. Moyer Decl. ¶ 48; Ex. 21. These

---

[15] Moyer Dep. 56:1-59:14, 60:22-63:20, 218:11-219:16.

[16] Thus, Amazon's argument that Moyer somehow used the information from this document in his interview with Google because he viewed the document immediately beforehand is fatally flawed. *See infra* Section II.B.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

discussions were apparently not particularly memorable: when Frank Fallon (Moyer's manager) was asked if he could name any healthcare deals that were discussed as of mid-May (when Moyer last attended the Top 100 deals meeting), the only one Fallon could recall was AWS's deal with Cerner. Fallon Dep. 127:11-21. This is perhaps unsurprising, given that this deal had just been publicly announced the week prior to Fallon's deposition.[17]

Perhaps Amazon's most egregious example of attempting to charge Moyer with continuing knowledge of confidential information based on his "access" to it centers around Moyer's role as an official signatory for AWS. In this role, Amazon admits that it presented Moyer with "hundreds of contracts from all different industries." Fallon Decl. ¶ 24. It apparently does not dispute the fact that not only was Moyer not required to read these contracts, his manager explicitly told him, "You shouldn't be reading any of the things you sign." Moyer Dep. 136:4-137:2. *See also* Fallon Decl. ¶ 24. And yet, Fallon now asserts that "Moyer could undercut AWS's (sic) in negotiating with customers on behalf of Google" based on his merely having "had the opportunity to read" the very same documents *that Fallon himself instructed him not to read*. Fallon Decl. ¶ 24.

In essence, Amazon asserts that Moyer cannot compete fairly with AWS because of his former access to dozens of documents and hundreds of pages of spreadsheets, regardless of what information he *actually remembers* from documents that he has not accessed in months, if not years. None of the Washington cases cited by Amazon support this argument. Rather, each of these cases deal with the solicitation of past customers, something that Moyer will not be doing at Google. *See Emerick v. Cardiac Study Center, Inc.*, 357 P.3d 696, 723 (Wash. Ct. App. 2015); *NW Mobile Serv. v. Schryver Med. Sales*, No. C06-5227 RBL, 2006 WL 1799620, at *2 (W.D. Wash. Jun. 28, 2009); *US Water Serv. v. Itoh*, No. C11-5144BHS, 2011 WL 834167 at *1-2 (W.D. Wash. Mar. 3, 2011).

Here, Moyer has testified—repeatedly and consistently—that he did not commit to

---

[17] *See* Cerner Leads New Era of Health Care Innovation, https://www.cerner.com/blog/cerner-leads-new-era-of-health-care-innovation/ (July 30, 2019).

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

memory and does not currently recall the vast majority of the cross-vertical information that

Amazon gave him "access" to during his time at AWS. Moreover, the circumstances surrounding

*how* Moyer was exposed to this information in the first place make it clear why it would not be

reasonable to expect Moyer to still remember any pertinent details. *See, e.g.*, *TBB Global*

*Logistics, Inc. v. ICAT Logistics, Inc.*, Civ. No. WDQ-13-1428, 2013 WL 2302677, at *3 (D.

Md. May 23, 2013) (declining to issue TRO where the purported trade secret was so voluminous

and complex it was "impossible" for former employee to remember).

> 3.    **Moyer's involvement in the remaining yet-to-be announced projects was limited and would not provide Moyer any unfair competitive advantage in selling GCP to healthcare customers.**

With regard to the other cross-services projects discussed in AWS's motion and

declarations, AWS grossly exaggerates Moyer's involvement in and knowledge of the projects.

Contrary to AWS's assertions, Moyer did not lead or even significantly contribute to any of these

initiatives.

███████████: Moyer's involvement was limited to a handful of meetings and

introducing the team to his customer leads. (Exs. 22-26; Moyer Decl. ¶ 51; Fallon Dep. 118:6-

119:14. Moyer participated in a single phone call about ██████████████████

████████████████████████████ Moyer Dep. 161:5-162:4. Moyer

never saw the ████████ or learned what became of this project. *Id.*; Moyer Decl. ¶ 51.

███████████: Moyer had no formal role in ███████. He provided introductions and

spoke to the project head about use cases for financial services. Fallon Dep. 124:14-125:4. Not

even Moyer's boss knew what customers ████ was being targeted to outside of Financial

Services. Fallon Dep. 120:23-121:9.

███████████: This initiative was led by Brent Jay. Moyer's work regarding

████████████████ is in his publicly available resiliency whitepaper and generally known in

the industry. ████████████████████████, is in

the whitepaper. Ex. 17 at 38-42; Clayville Dep. 148:7-151:5.

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 17

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1   ███████████████: Moyer had no involvement in the ██████████████Moyer

2   Decl. ¶ 52. Moyer received a single email in preparation for a briefing of one of his customers.

3   Fallon Decl. Ex. C; Moyer Decl. ¶ 52. Moyer's work regarding ███████████ of his

4   customers was included in Moyer's public white paper regarding resiliency. Ex. 17 at 15.

5   ████████████████████████████████████████████████████

6   ████████████████████████████████ but was in San Francisco the day

7   Amazon claims he was at a ███████████████████. Moyer did not

8   know about the roadmap more broadly or how it would apply to other industries. Declaration of

9   Dan Neault, Exs. A-D (ECF No. 34); Moyer Decl. ¶ 55

10                                           *   *   *

11        Moyer's role in each of these projects was limited to his customers. Notably, Moyer had

12   no role in the actual development of any of these products. Moyer has never written (nor even

13   seen) the code for any of these projects. In fact, he has never seen anything other than high level

14   architecture diagrams. Moyer Decl. ¶ 56. And for most, he hasn't even seen that. *Id.*

15        But most importantly, AWS does not identify any way that Moyer would use this

16   information in selling Google Cloud services to healthcare companies. It is undisputed that

17   Moyer will not have any role in developing Google's product roadmap beyond passing along

18   feature requests from customers to the product teams. Because he will not have input on the

19   roadmap, Moyer's only opportunity to "use" this information would be to discuss it with

20   customers. But that would be wholly illogical. What benefit would it be to Google for Moyer to

21   inform a customer that AWS is coming out with a new product? Moyer's knowledge of these

22   products would not provide him (or Google) any competitive advantage in selling Google's

23   products.

24   **II.    Amazon has not shown that it is likely to suffer irreparable harm in the absence of
            preliminary relief**

25        To succeed on its motion for a preliminary injunction, Amazon "must establish that

26   irreparable harm is likely, not just possible." *Cottrell*, 632 F.3d at 1135. The rule that Amazon

27

RESPONSE TO MOTION FOR PRELIMINARY INJUNCTION - 18

1   urges this Court to follow—that a party can obtain a preliminary injunction where it

2   demonstrates a strong likelihood of prevailing on the merits, but a weaker showing of irreparable

3   harm—is not the law, and indeed was *explicitly overruled by the Supreme Court* in *Winter v.*

4   *Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008).

5        Nor is Amazon correct that "irreparable injury may be *presumed* in cases involving

6   breach of a noncompete." Mot. at 19. This is exactly the *opposite* of what the Eleventh Circuit

7   held in *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991), which

8   Amazon cites in support of this doctrine of "presumed irreparable injury." The presumption

9   discussed in *Ferrero* not only arose under *Georgia* law, but was rejected by the Eleventh Circuit,

10  which held that the *federal* preliminary injunction standard controlled. *Id.* at 1448.

11       Courts in the Ninth Circuit have held likewise, and "repeatedly applied the federal

12  standard when faced with requests for injunctive relief based on state causes of action." *Kane v.*

13  *Chobani, Inc.*, No. 12-CV-02425-LHK, 2013 WL 3776172, at *3 (N.D. Cal. July 15, 2013)

14  (collecting cases); *Anselmo v. Mull*, No. CIV. 2:12-1422 WBS, 2012 WL 5304799, at *5 (E.D.

15  Cal. Oct. 25, 2012) (denying injunction after refusing to apply California law presuming

16  irreparable injury in the nuisance per se context). In fact, "[t]here is no Ninth Circuit law which

17  holds that breach of a non-compete clause gives rise to an inference of irreparable harm." *A*

18  *Place For Mom, Inc. v. Leonhardt*, No. C06-457P, 2006 WL 2263337, *3 (W.D. Wash. 2006).

19  Instead, a company claiming irreparable injury to its business and goodwill must offer "concrete

20  evidence" of such harm, rather than mere speculation. *Cloanto Corp. v. Hyperion Entm't CVBA*,

21  No. C18-381RSM, 2019 WL 1489185 (W.D. Wash. Apr. 3, 2019) (Martinez, C.J.) (citing

22  *Mirina Corp. v. Marina Biotech*, 770 F. Supp. 2d 1153, 1162 (W.D. Wash. 2011)).

23       Of course, the reason Amazon may feel the need to reach for overturned doctrines and

24  nonexistent presumptions *is it cannot prove this element on the merits*. To establish irreparable

25  injury, Amazon must establish that Moyer *cannot* compete with AWS except by competing

26  unfairly. As discussed above, this is not a case where there is any risk of Moyer trading on the

27  goodwill that AWS has established with the ▇ customers he worked with at AWS. Moyer will

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

be selling not just to a different group of customers, but an entirely different industry, and he and Google would readily agree to any restrictions the Court deemed necessary to screen him from exposure to the financial services vertical at Google. Moyer Decl. ¶ 75; Enslin Dep. 166:20-167:21.[18]

As a result, Amazon's objections necessarily center around the *information* that Moyer might take with him to Google, and what he could do with that information once he begins working there. As noted above, Moyer's access to confidential information outside of his industry vertical was limited, and information regarding the particular customers he worked with (or even the financial services industry as a whole) would not be implicated in his new role selling to an entirely different industry at Google.

What little remains is protected and will remain protected by Moyer's separate nondisclosure agreement with Amazon, which requires Moyer—in perpetuity—to refrain from disclosing or using any of Amazon's Confidential Information. Agreement ¶ 3.1. Amazon's entire claim, however, is predicated on the theory that Moyer's nondisclosure agreement is insufficient to protect Amazon's confidential information, either because Moyer would "necessarily rely on his knowledge of AWS's confidential information if he goes to work for Google in cloud sales," Fallon Decl. ¶ 27, or because there is some reason to conclude that Moyer would disclose Amazon's information deliberately. Amazon cannot presume this—it must prove it, and prove it with more than conclusory statements opining that it is "inconceivable" that Moyer could work at Google Cloud without violating his nondisclosure agreement. Mot. at 22; Fallon Decl. ¶ 28. *See Elec. Evidence Discovery, Inc. v. Chepalis*, No. C07-1929RSL, 2007 WL 4376194, at *2 (W.D. Wash. Dec. 13, 2007) ("The mere fact that [an employee] has protectable information does not mean that she will use that information in a way that violates the agreement.").

---

[18] Indeed, the only reason that such restrictions do not exist already is because Moyer *is not attending these meetings at all*, and is currently sitting out from all substantive work for Google during the pendency of Amazon's motion. Enslin Dep. 167:4-9; Bugaighis Decl. ¶ 5. Had Amazon and Google been able to reach an agreement regarding Moyer's role in Google Cloud, Google would have created a set of restrictions, documented them, and ensure that they were enforced. Enslin Dep. 167:4-9.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

A.      **Moyer can easily perform his job at Google without using or disclosing AWS confidential information.**

The evidence clearly establishes that Moyer's new position at Google will neither require him or even tempt him to use or disclose what limited Amazon confidential information he knows. As an initial matter, Google takes compliance with employees' intellectual property restrictions "extremely seriously," and requires its employees to undergo compliance training in their first weeks at the company. Enslin 105:20-106:6; Blackstone Decl. Exs. 1-2. Moyer is fully aware that he is legally obligated not to share any confidential information in his possession, not simply from AWS, but from any company he has worked for in the past. Moyer Decl. ¶ 76.

Amazon imagines that Google's strategic focus in cloud computing involves trying to identify and steal AWS confidential information, anticipate and blunt AWS strategic initiatives, or reverse-engineer and undercut AWS's pricing. This is not how Google runs its business, and this is not how Moyer views his new position with the company.

Moreover, both AWS and Google have repeatedly stated that they focus on their *own* capabilities and their *own* ability to meet their customers' demands rather than focusing on their competitors. Asked directly whether it was important to understand what Google's competition was offering in order to sell Google products most effectively, the president of Google Cloud Sales testified that in fact, it was "important to understand what the *customer* needs and requires" and that it was "not necessarily relevant to know what . . . any of the competitors are offering in that space." Enslin 53:22-54:14. Amazon has a similar sales philosophy, training Moyer and other salesmen "not to talk about competitors but instead just simply talk about [AWS's] capabilities."[19] Moyer Dep. 172:23-174:3. *See also* Clayville Dep. 135:7-16 (noting that AWS's customers are free to share this type of information with competitors).

Moreover, Moyer will simply not be in a position to affect product development for Google Cloud. Moyer was hired to execute Google's sales strategy for healthcare in Google

---

[19] AWS's CEO has publicly stated that AWS is "customer-focused" rather than "competitor-focused." *See AWS CEO: We're customer-focused, not competitor-focused*, CNBC (May 9, 2018), *available at* https://www.cnbc.com/video/2018/05/09/aws-ceo-were-customer-focused-not-competitor-focused.html.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Cloud. In that regard, he will be "responsible for how his team approaches the customer and how they present their business case." Enslin Dep. 52:24-53:21. He will *not*, however, be "involved in determining which products come to market, how those products come to market, [or] how pricing is determined." *Id.* Although Moyer would help gather product feature requests from customers to pass along to the engineering teams, Moyer would not be called on to *select* which customer feature requests the engineering teams should fulfil, and therefore will not be *able* to influence Google's product development roadmap. Enslin Dep. 157:3-159:20.[20]

### B.  Moyer has demonstrated his ability to protect AWS confidential information during his interview process and preliminary engagement with Google.

During the process of interviewing for his position at Google, Moyer was transparent not only about the fact that he had a noncompete agreement, but also about the fact that his nondisclosure agreement prevented him from fulling answering some of the questions he was asked. Moyer Dep. 170:16-22.[21] During the interview, Moyer was asked about and discussed the financial services industry, the data policies demanded by regulated industries, the ISV ecosystem, and the perceived strengths and weaknesses of AWS and Google Cloud. Ex. 27. And for each and every one of these questions, Moyer limited his answers to publicly available information, *even though he knew AWS confidential information that would have been responsive to these interview topics*. Moyer Dep. 214:19-215:6.

Amazon's claim that Moyer provided Google with AWS confidential information at this interview is ridiculous. First, as explained above, Amazon's claim that Moyer reviewed ███████ ███████ on May 15, 2019 is false. *See supra* Section I.C.2. Second, Moyer's made his comments regarding ████████████████████████████████████ ████████████████████████████████████████

---

[20] Nor does it appear that Google believes such information would be particularly valuable, in any event, testifying that it was "highly unlikely" that the so-called "blockers" to customer adoption were not already widely known across the industry. Enslin Dep. 150:20-151:7.

[21] For example, Google's own interview notes reflect that Moyer even declined to specify the exact size of the team he managed at AWS, citing his nondisclosure agreement. Ex. 27 at GOOGLE-000068.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

████████████████████████.[22] And the idea that a software company must utilize the existing ecosystem of independent software vendors before it can start selling software to a given industry is simply not confidential information, but is something known to every computing company in the world and that AWS admits Microsoft is a leader in. Enslin Dep. 164:11-165:5; Ex. 28 at 4. Moyer himself has 25 years of experience working with or even running ISVs. Moyer Dep. 55:1-25; Moyer Decl. ¶ 24. Indeed, Amazon relied on Moyer's expertise in this area when he first began working for the company in an effort to blunt Microsoft's advantage in this arena. Moyer Dep. 145:23-147:6.

### C. Amazon has made previous erroneous claims that AWS sales executives cannot work for Google Cloud without using AWS confidential information.

This is not the first time that Amazon has cried wolf by claiming that an AWS sales executive cannot work for Google without necessarily using and divulging AWS confidential information, as this was the exact same argument it advanced in *Powers*, 2012 WL 6726538. Powers, as previously noted, was an even higher-level AWS sales executive than Moyer who Amazon claimed would be unable to carry out his responsibilities at Google without inevitably using or disclosing AWS confidential information. *Id.*, at *7. Powers disagreed forcefully with this contention, explaining that much of the information that AWS sought to prevent him from disclosing was public. Ex. 9 (Powers Decl.) ¶¶ 20-22, 24. Powers further explained that while his *public* knowledge and general skill and experience would be useful in his work for Google, he had no need to utilize, much less disclose, any confidential AWS information to do his job at Google. Ex. 9, ¶ 19.[23]

The court ultimately agreed with Powers, entering an injunction that did nothing more than bar him from working with his former AWS customers, and even then only for a period of

---

[22] *See* ███████████████████████████████████████████████████████████████████████ Indeed, a simple Google search for ███████████████ returns numerous hits listing ███████████ as top ████████████. *See e.g.,* ██████████████████████████████████████████████████████████

[23] Indeed, when Powers first joined AWS, Amazon took the position that Powers would be able to do the same job that he had done at IBM without using or disclosing information from his prior employer. Ex. 9 (Powers Decl.) ¶ 11.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1   nine months. *Powers*, 2012 WL 6726538, at *12. Powers resumed work at Google shortly

2   thereafter, and his work for the company was public and largely visible to Amazon. Contrary to

3   the allegations raised in its lawsuit, Amazon at no time alleged or complained that Powers had

4   used or disclosed AWS confidential information during his tenue at Google. Blackstone Decl.

5   ¶ 8. This Court should be therefore be deeply skeptical of Amazon's claim that it is

6   "inconceivable" that Moyer could do what Powers apparently was able to do with ease.

7   **III.    The balance of equities and public policy favor Moyer**

8         Amazon seeks to have Moyer completely sit out of the field in which he has worked for

9   over twenty-five years, potentially derailing his career. Moyer Decl. ¶ 79; Ex. 29. On the other

10  hand, Amazon has offered no evidence that Moyer's employment with Google selling to an

11  entirely different customer set in a different industry would have "an ongoing detrimental effect"

12  on its consumer goodwill or reputation. *See A Place For Mom*, 2006 WL 2263337, at *4.

13        Finally, important policy considerations weigh against issuing the injunction Amazon

14  seeks. The public's interest in protecting workers' freedom to use their labor and skill outweighs

15  the interest in protecting Amazon from competition. Washington has recently set out a strong

16  policy statement that "workforce mobility is important to economic growth and development."

17  Engrossed Substitute House Bill 1450, State of Washington, 66th Legislature, 2019 Regular

18  Session. Allowing the Agreement to stand as written would allow Amazon, and companies like

19  it, to overreach with impunity. Once the injunction is granted, the harm is done.

**CONCLUSION**

20        For the foregoing reasons, Amazon's Motion should be denied.

21        DATED this 3rd day of September 2019.

22

23

24                                    s/  Tyler P. Francis
                                      **ANGELI LAW GROUP LLC**

25                                    Tyler P. Francis, WSBA No. 53533
                                      Joanna T. Perini-Abbott, OSB No. 141394

26                                       (*admitted pro hac vice*)

27                                    *Attorneys for Defendant Philip Moyer*

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880