1

2

3

4

5

6          UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF WASHINGTON
7                    AT SEATTLE

8    AMAZON.COM, INC.,                    CASE NO. C19-1176 RSM

9              Plaintiff,                 ORDER GRANTING IN PART
                                          AMAZON'S MOTION FOR
10        v.                              PRELIMINARY INJUNCTION

11   PHILIP MOYER,

12             Defendant.

13

## I.      INTRODUCTION

14

15        Plaintiff Amazon.com, Inc. ("Amazon") seeks to prevent Defendant Philip Moyer

16   ("Moyer") from working for Google as its Vice President, Healthcare, Google Cloud.  Dkt. #19.[1]

17   Moyer previously worked for Amazon as a sales executive for Amazon Web Services ("AWS"),

18   selling its cloud computing services to the financial services sector.  As a condition of his

19   employment, Amazon required Moyer to accept restrictions on his future employment, should

20   he ever stop working for Amazon.

21

22

23   ────────────────────
     [1] The Court cites to the record by the docket numbers and pagination applied by the Court's
24   CM/ECF system.  Where the nature of the document permits the Court to appropriately and
     clearly cite to numbered paragraphs or page and line numbers, the Court does so.

ORDER – 1

Two years later and unhappy with his opportunities for growth at AWS, Moyer sought opportunities outside of Amazon. Google Cloud, a competing cloud services provider, ultimately hired Moyer. Cognizant of Moyer's prior obligations to Amazon, but interested in effectively utilizing his skills, Google Cloud plans to have Moyer serve as Google Cloud's Vice President of sales for the healthcare and life sciences sectors ("healthcare").

Amazon maintains that Moyer's new position will force him to violate his prior obligations to Amazon and seeks a preliminary injunction preventing him from performing in the position. Dkt. #19. Moyer resists Amazon's effort to restrict his work on the basis that his new role will not involve the same customers and that he will not be forced to violate his agreement because the needs of healthcare customers are distinct from those of financial services customers. Dkt. #43.

The Court heard oral argument in this matter on September 12, 2019, and took the matter under advisement. Having further considered the matter, the Court grants the Motion in part.

## II.     BACKGROUND

### A. Cloud Computing Sales

AWS and Google Cloud directly compete, and compete with others, in providing cloud computing services.[2] "Cloud computing is the on-demand delivery of computing power, software, storage, and other information technology services via the internet." Dkt. #23 at ¶ 3. Cloud computing services essentially allow customers to "rent" hardware and software that they can then access remotely. *Id.* This allows customers to avoid upfront computing costs and better account for fluctuations in their computing needs. *Id.*

---

[2] Amazon is the market leader, followed by Microsoft. Google trails with a pack of other companies. Amazon points out, that "Google Cloud's own website maps its services to AWS so that potential customers can identify which Google services offer similar functionality to AWS." Dkt. #19 at 7 (citing https://cloud.google.com/free/docs/map-aws-google-cloud-platform).

Individual cloud computing services can have application across industries. AWS, for instance, develops a variety of services performing specific functions and makes those services available to all its customers. *Id.* at ¶ 9. However, customer needs across industries vary. For this reason, AWS groups its "cloud sales teams into 'verticals'" that have similar computing needs—whether by industry or customer attribute. Dkt. #21 at ¶ 4. Financial services customers, for instance, are highly regulated and have a heightened need for reliability, security, and privacy. Dkt. #19 at 2.

## B. Moyer's Background

Moyer has worked in technology sales since 1991. Dkt. #45 at ¶ 2. Through his career he has served as a general manager with Microsoft, served as the CEO of a company providing access to financial data, and managed a technology portfolio at a venture capital firm investing in enterprise cloud, financial technology, and healthcare technology. *Id.* at ¶¶ 2–5. In March 2017, Amazon hired Moyer as its "Director of Sales" for AWS Global Financial Services. Dkt. #30 at 2 (¶¶ 3–5), 12. As a condition of his employment, Moyer was required to sign a Confidentiality, Noncompetition, and Invention Assignment Agreement (the "Agreement") with Amazon. *Id.* at 6–10. The Agreement required Moyer to maintain the secrecy of confidential information learned during his employment[3] and, most relevant here, restrained Moyer's post-Amazon employment:

---

[3] The Agreement required Moyer, both "[d]uring employment and at all times thereafter," to "hold all Confidential Information in strictest confidence and [] not acquire, use, publish, disclose, or communicate any Confidential Information" without approval." Dkt. #30 at 6–7 (sec. 3.1). In the same provision, the Agreement broadly defined "Confidential Information" as:

> proprietary or confidential information of Amazon in whatever form, tangible or intangible, whether or not marked or otherwise designated as confidential, that is not otherwise generally known to the public, relating or pertaining to Amazon's business, projects, products, customers, suppliers, inventions, or trade secrets, including but not limited to: business and financial information; Amazon

During employment and for 18 months after the Separation Date, Employee will not, directly or indirectly, whether on Employee's own behalf or on behalf of any other entity (for example, as an employee, agent, partner, or consultant), engage in or support the development, manufacture, marketing, or sale of any product or service that competes or is intended to compete with any product or service sold, offered, or otherwise provided by Amazon (or intended to be sold, offered, or otherwise provided by Amazon in the future) that Employee worked on or supported, or about which Employee obtained or received Confidential Information.

*Id.* at 7 (Sec. 4.1). Moyer also agreed not to solicit Amazon customers and partners or seek to recruit Amazon employees. *Id.* (Secs. 4.2 and 4.3). Despite agreeing to these provisions, Moyer maintains that he was informed, both at the time of his hire and after, that Amazon generally negotiated its broad noncompete provision to a more limited scope if a salesperson left to work with a different customer base. Dkt. #45 at ¶¶ 9–11.

## C. Moyer's Work at Amazon

As the Director of Sales for Global Financial Services, Moyer's primary responsibility was "selling AWS services to companies in the financial services industry." Dkt. #23 at ¶ 8; *see also* Dkt. #45 at ¶ 19; Dkt. #49-3 at 19:4–20:4, 81:14–83:11, 89:20–98:3. This required him to have a firm understanding of existing AWS services as well as planned services (AWS's "roadmap"). Dkt. #23 at ¶ 10.

[L]ike other AWS executives, Moyer was responsible for understanding: (1) AWS's existing and projected services; (2) the value and efficiency those services deliver to customers; (3) the limitations, gaps, and weaknesses, of those services;

techniques, technology, practices, operations, and methods of conducting business; information technology systems and operations; algorithms, software, and other computer code; published and unpublished know-how, whether patented or unpatented; information concerning the identities of Amazon's business partners and clients or potential business partners and clients, including names, addresses, and contact information; customer information, including prices paid, buying history and habits, needs, and the methods of fulfilling those needs; supplier names, addresses, and pricing; and Amazon pricing policies, marketing strategies, research projects or developments, products, legal affairs, and future plans relating to any aspect of Amazon's present or anticipated businesses.

(4) what AWS services are forthcoming to address customer needs and service gaps; (5) how to obtain customer specific cloud service features and functionalities; (6) the service, pricing, storage volume, and workload capacity terms on which AWS provides those services to its customers; and (7) how AWS positions itself against other cloud computing companies—including [Google Cloud]—to best satisfy customer needs.

*Id.* Moyer was not necessarily selling a specialized product. *Id.* at ¶ 9 (AWS services are developed to have "broad applicability" and support specific industries with limited modifications). Rather, Moyer knew the industry requirements for his thirty-two financial services customers[4] and highlighted how AWS services could meet their existing and future needs.

Outside of his core function, Moyer's position also involved him in several other aspects of AWS's operations. First, Amazon involved Moyer in identifying and removing barriers to the sale of AWS services both within financial services and in other sales verticals. For instance, due to his prior work experience with Independent Software Vendors[5] ("ISVs"), Moyer aided AWS in its relationships with ISVs across sales verticals, fostering better integration with AWS services. Dkt. #45 at ¶¶ 24–26. More generally, Moyer served as an intermediary between customers and AWS development teams to solve any issues or service gaps customers encountered while using AWS services. Dkt. #49-3 at 134:1–140:17. Customers shared any issues or gaps with Moyer who sought out solutions or work-arounds. Dkt. #45 at ¶¶ 31–34.

---

[4] Moyer represents that his team "sold AWS services to the 32 largest United States-based global financial services companies." Dkt. #46 at ¶ 20. These included "banks, capital markets institutions, insurance companies, financial market utilities (the infrastructure for transferring, clearing, and settling payments, securities, and other financial transactions among financial institutions or between financial institutions and the system)." Dkt. #24 at ¶ 6.

[5] ISVs are existing and widely used software providers within specific industries. Assuring that AWS services integrate seamlessly with existing ISVs can allay industry concerns about adopting AWS services and facilitate sales.

Moyer's team would track and relay common issues or gaps that could not be resolved for possible action by development teams, but, other than advocating for certain changes, Moyer did not play an active role in determining the AWS roadmap. Moyer's financial services vertical also served as a sort of development and testing ground because of the heightened regulatory, audit, and security requirements of its customers. Dkt. #24 at ¶ 11. Moyer also took a proactive approach to removing adoption barriers. For example, Moyer's financial services customers relied on computing resiliency—assuring that outages are avoided or shortened—, so Moyer aided AWS in developing a report to demonstrate that AWS could satisfy the stringent industry requirements. Dkt. #45 at ¶¶ 28–30.

Second, Moyer was also involved in formulating sales strategies of AWS services both within financial services and across other sales verticals. Within financial services, Moyer contributed to "financial services sales strategy planning documents for 2019 and 2020 that set AWS's worldwide sales goals through the end of 2021." Dkt. #24 at ¶ 21. Outside of financial services, Moyer was involved in setting "sales strategy for the entirety of AWS cloud globally." Dkt. #19 at 10 (citing Dkt. #21 at ¶¶ 4–6). This included being involved in decisions about where to focus resources to maximize sales. Dkt. #24 at ¶ 21. The parties disagree as to whether Moyer's involvement was limited to focusing on his financial services customers or whether he played a more expansive role.

### D. Moyer Leaves for Google

From the beginning, Moyer anticipated a promotion within AWS to Vice President of Sales for AWS financial services. When that plan was delayed and did not materialize, Moyer began to explore his other employment opportunities. By April 2019, he planned to leave AWS for a position as a CEO of a company providing "governance, risk, compliance advisory services,

and technology solutions." Dkt. #46 at ¶ 60.  Amazon attempted to retain him but was unwilling to meet his salary request.

During the process of his anticipated job change, Moyer contacted Ms. Kliphouse, a colleague from Microsoft, to serve as a reference.  Ms. Kliphouse was in the process of being hired as Google Cloud's North American President.  *Id.* at ¶ 60.  Ms. Kliphouse encouraged Moyer to apply to Google Cloud and supported him within Google Cloud.  Dkt. #39 at 30:8–31:14; Dkt. #49-2 at 21:9–22:6.  Google Cloud ultimately decided to make Moyer an offer and, aware of Moyer's offer for the CEO position, made it a high one.  Dkt. #45 at ¶ 62.  Moyer indicated to AWS, on May 22, 2019, that he was joining Google Cloud "as their Vice President of Healthcare."  Dkt. #23 at ¶ 26.

## III.    DISCUSSION

### A. Standard of Review

In determining whether to grant a preliminary injunction, courts consider: (1) the likelihood of the moving party's success on the merits; (2) the possibility of irreparable injury to that party if an injunction is not issued; (3) the extent to which the balance of hardships favors the moving party; and (4) whether the public interest will be advanced by the injunction. *See Miller v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980).  The Ninth Circuit has often compressed this analysis into a single continuum where the required showing of merit varies inversely with the showing of irreparable harm.  *See Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867, 874 (9th Cir. 2000).  Thus, Plaintiff will be entitled to preliminary relief if it is able to show either: (1) probable success on the merits and the possibility of irreparable harm; or (2) the existence of serious questions going to the merits and a fair chance

of success thereon, with the balance of hardships tipping sharply in favor of an injunction. *Miller*, 19 F.3d at 456.

### B. Likelihood of Success on the Merits

Amazon's Complaint pursues a single cause of action: breach of a noncompetition agreement. Dkt. #1-1 at ¶¶ 29–34. Amazon argues that if Moyer is not restrained from performing his new role, he will necessarily breach his promises not to compete with Amazon. Washington law[6] provides for the enforcement of reasonable noncompete clauses. *Labriola v. Pollard Grp., Inc.*, 152 Wash. 2d 828, 846, 100 P.3d 791, 799–800 (2004) (J. Madsen concurring). "The determination of whether a covenant is reasonable is a question of law." *Emerick v. Cardiac Study Ctr., Inc., P.S.*, 189 Wash. App. 711, 721, 357 P.3d 696, 701 (2015) (citing *Alexander & Alexander, Inc. v. Wohlman*, 19 Wash. App. 670, 684, 578 P.2d 530 (1978)).

To determine reasonableness, the Court considers:

> (1) whether the restraint is necessary to protect the employer's business or goodwill, (2) whether it imposes on the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill, and (3) whether enforcing the covenant would injure the public through loss of the employee's service and skill to the extent that the court should not enforce the covenant, i.e., whether it violates public policy.

*Emerick*, 357 P.3d at 701 (citing *Perry v. Moran*, 109 Wash.2d 691, 698, 748 P.2d 224 (1987), *judgment modified on recons. on other grounds*, 111 Wash.2d 885, 766 P.2d 1096 (1989)).

> Washington courts are relatively deferential to employers in enforcing agreements restricting a former employee's work with the employer's clients or customers. Courts are less deferential to general restrictions on competition that are not tied to specific customers. An employer can demonstrate that more general restrictions are necessary, but can do so only by pointing to specific information about the nature of its business and the nature of the employee's work. Finally,

---

[6] The parties agree that the dispute is governed by Washington law, as provided for in the Agreement. Dkt. #30 at 9 (sec.7.3) (Agreement to "be governed by and construed in accordance with the laws of the State of Washington"); Dkt. #19 at 17 (applying Washington law); Dkt. #43 at 8 (same).

although courts are somewhat deferential about the duration or geographic extent of noncompetition agreements, they will readily shorten the duration or limit the geographic scope, especially where the employer cannot offer reasons that a longer or more expansive competitive restriction is necessary.

*Amazon.com, Inc. v. Powers*, Case No. C12-1911RAJ, Dkt. #31 at 15, 2012 WL 6726538 at *9 (W.D. Wash. Dec. 27, 2012).

### 1. Is a Restriction Necessary to Protect Amazon's Business or Goodwill?

The inquiry begins, of course, by considering the business interests at stake. Washington provides broad protection to tangible and intangible business interests and goodwill.[7] *Oberto Sausage Co. v. JBS S.A.*, Case No. C10-2033RSL, Dkt. #36 at 9, 2011 WL 939615 at *5 (W.D. Wash. Mar. 11, 2011) (noting that employer not only "has a legitimate interest in protecting its confidential information" but also "in avoiding unfair competition" based upon confidential information learned during the scope of employment); *Knight, Vale & Gregory v. McDaniel*, 37 Wash. App. 366, 369–70, 680 P.2d 448, 452 (1984) (employer had "legitimate business interest

---

[7] Washington courts have most often considered goodwill in the context of professional practices caught up in dissolutions and divorces. Regardless, the Court finds those cases instructive. Goodwill is intangible property, separate and apart from earning capacity. *Matter of Marriage of Crosetto*, 82 Wash. App. 545, 553, 918 P.2d 954, 958 (1996). Generally, it is best thought of as "the monetary value of a reputation" or as "representing the expectation of a continued public patronage." *Dixon v. Crawford, McGilliard, Peterson & Yelish*, 163 Wash. App. 912, 918–19, 262 P.3d 108, 112 (2011); *In re Marriage of Monaghan*, 78 Wash. App. 918, 926, 899 P.2d 841, 845 (1995). More specifically, goodwill is

> a benefit or advantage "which is acquired by an establishment beyond the mere value of the capital, stock, funds or property employed therein, in consequence of the general public patronage and encouragement, which it receives from constant or habitual customers on account of its local position, or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices."

*In re Marriage of Lukens*, 16 Wash. App. 481, 483–84, 558 P.2d 279, 281 (1976). Notably, the Washington Supreme Court has cautioned that not every business necessarily develops goodwill and that the "evaluation of goodwill must be done with considerable care and caution." *In re Marriage of Hall*, 103 Wash. 2d 236, 243, 692 P.2d 175, 179 (1984) (citation omitted).

ORDER – 9

in maintaining [its] large and profitable clientele" especially where employee had gained "extensive, valuable knowledge of the clients' business and internal operations and develop[ed] a close, familiar working relationship with the client"). But the protections have limitations and do not, for instance, extend to "skills acquired by an employee during his or her employment." *Copier Specialists, Inc. v. Gillen*, 76 Wash. App. 771, 774, 887 P.2d 919, 920 (1995).

The Court first notes that several aspects of the case already provide Amazon with significant protection. Amazon does not allege that Moyer possesses or has access to any documents containing its confidential or proprietary information. *C.f. Powers*, 2012 WL 6726538 at *5 (concern limited when confidential information was "in [employee's] memory alone" and employee may be unable to recall it). Amazon does not allege that Moyer will disclose Amazon's confidential or proprietary information. *See Oberto Sausage*, 2011 WL 939615 at *5 (noting employer's interest "in avoiding unfair competition" based upon its confidential information). And Amazon does not allege that Moyer will contact his former AWS customers or jeopardize Amazon's relationship with his customers. *C.f. Genex Co-op., Inc. v. Contreras*, Case No. C13-3008SAB, 2014 WL 4959404 at *6 (E.D. Wash. Oct. 3, 2014) (noting that the "Supreme Court of Washington has suggested covenants may need to be limited to soliciting or serving former clients") (citing *Wood v. May*, 73 Wash. 2d 307, 312, 438 P.2d 587, 590 (1968); *Columbia College of Music v. Tunberg*, 64 Wash. 19, 116 P. 280 (1911)).

The interests at issue here are the knowledge and information Moyer has learned and the business relationships he has forged while working for Amazon. Moyer interacted with AWS's financial services customers extensively, building relationships, gaining insight into their business needs, and negotiating contracts. Dkt. #23 at ¶¶ 22–23; Dkt. #49-3 at 19:4–20:4, 81:14–83:11, 89:20–98:3. But Moyer was also exposed to and involved in drafting documents setting sales strategies across all AWS sales verticals. Dkt. #21 at ¶ 22; Dkt. #23 at ¶ 21. Additionally,

Moyer was exposed to documents highlighting future services and features in various stages of planning, development, and implementation. Dkt. #23 at ¶¶ 11–12. Lastly, Moyer was exposed to discussion of ongoing sales opportunities, including both those within financial services, healthcare, and all other verticals. *Id.* at ¶ 20.

The Court has little difficulty finding that Amazon has identified legitimate business interests and goodwill. Most significantly, Amazon retains a significant interest in the goodwill it has built with its existing customers. *Nw. Mobile Servs., L.L.C. v. Schryver Med. Sales & Mktg., Inc.*, Case No. C06-5227RBL, Dkt. #25 at 3, 2006 WL 1799620 at *2 (W.D. Wash. June 28, 2006) (noting "protectable interests, including customer lists and relationships"); *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1205, 1217 (E.D. Wash. 2003) (noting employer's "enhanced" interest because the "nature of the accountant-client relationship" made employee "exceptionally competitive" with regard to employee's clients). Further, Amazon has an interest in maintaining the competitive advantage it anticipates from its sales strategies, new features, and new services. *See Organo Gold Int'l, Inc. v. Ventura*, Case No. C16-487RAJ, Dkt. #27 at 11, 17, 2016 WL 1756636 at *6, *10 (W.D. Wash. May 3, 2016) (noting distributor's knowledge of employer's guidelines would allow him to unfairly recruit employer's other distributors, especially where business model depended on distributors).

In considering whether a noncompete provision is necessary to protect these interests, the Court again notes the existence of the nondisclosure and non-solicitation provisions. These adequately address Amazon's interests in preventing Moyer from directly contacting his AWS customers and from directly disclosing Amazon's confidential information. Moyer cannot disclose Amazon's confidential information to Google Cloud's existing and potential customers or partners. Moyer cannot disclose Amazon's sales strategies to Google Cloud so that it may

formulate more competitive strategies of its own. Nor can Moyer disclose who Amazon views as important partners and customers so that Google Cloud may target them.

But Amazon's concern extends beyond disclosure of its confidential information. Amazon is also concerned that Moyer's role at Google Cloud is essentially the same role he had with AWS, albeit with different customers,[8] and that his knowledge of Amazon's confidential information will effectively "taint" his actions. At Google Cloud, Moyer will weigh in on strategy decisions and will make strategy decisions of his own. Amazon believes that he will use its confidential information to make decisions that provide Google Cloud competitive advantages against Amazon's plans. Amazon also believes Moyer will use his knowledge of its product roadmaps to steer Google Cloud towards developing similarly competitive services. Because Moyer knows of issues experienced by existing AWS customers, Amazon believes he will be able to prey on those existing issues in convincing existing customers that Google Cloud offers preferable services, a significant blow to Amazon's goodwill. Lastly, Amazon believes that potential customers, learning that he was formerly sold AWS services, will place undue weight on his representations that Google Cloud provides superior services.

The Court agrees that these are the essential considerations. Moyer agreed not to unfairly compete with Amazon after leaving its employ. The noncompete provision is necessary to protect Amazon from Moyer positioning Google Cloud to better compete with AWS even if he does not disclose confidential information in the process. No other provision of the Agreement can protect these business interests and goodwill.

---

[8] While the responsibilities for the two positions are similar, Moyer represents that he "will not work with any of the same customers, or even with customers in the same industry (financial services) as he worked with at AWS." Dkt. #43 at 4.

ORDER – 12

### 2. What is a Reasonable Restraint on Moyer to Protect Amazon's Interests?

The question then becomes whether the scope of the noncompete provision places restraints on Moyer's ability to earn a livelihood that are greater than are necessary to protect Amazon's business interests and goodwill. The Court's inquiry is guided by the scope of the noncompete as drafted. *Emerick*, 357 P.3d at 701 (considering the reasonableness "of the noncompete covenant as written as opposed to whether and how much the employer experiences actual harm and competition").

#### a. The Agreement is Unreasonable as Drafted

As drafted, there is little question that the restraint is unreasonable. The Agreement prohibits competition as to "any product or service sold, offered, or otherwise provided by Amazon (or intended to be sold, offered, or otherwise provided by Amazon in the future) that Employee worked on or supported, or about which Employee obtained or received Confidential Information." Dkt. #30 at 7 (Sec. 4.1). Amazon maintains that Moyer received confidential information about almost all AWS's product roadmaps and sales strategies. Resultantly, Moyer would be precluded from working for any competitor providing cloud services anywhere around the globe.[9] But such a scope would be a general restriction on competition, not a reasonable restriction on unfair competition. *See Powers*, 2012 WL 6726538 at *10; *Organo*, 2016 WL 1756636 at *7 (noting that noncompete should be limited to a product type, not a business model, and approving of a noncompete limited to "a very specific type of competitive venture").

#### b. Some Restraint is Reasonable

This does not conclude the inquiry though, as Washington law provides that the Court may reform the provision to a more limited—and reasonable—scope. *Emerick*, 357 P.3d at 703

---

[9] The parties do not dispute that a global restriction is reasonable.

1   ("court should still seek to enforce the covenant to the extent reasonably possible to accomplish

2   the contract's purpose.") (citing *Wood*, 438 P.2d at 590–91). Washington law, however, does

3   not require that the Court reform the provision. *Genex Co-op.*, 2014 WL 4959404 at *4. The

4   Court therefore pauses to consider whether reformation is appropriate in this case.

5          Amazon made no attempt to tailor its noncompete restrictions to the job it hired Moyer

6   to perform. *Powers*, 2012 WL 6726538 at *10 (noting that the failure to tailor a noncompete

7   provision to the individual employee's situation cuts against full enforcement). Rather, Amazon

8   turns a legal shield into a sword by relying on the possibility of reformation. Amazon's already

9   broad noncompete expands further if Amazon exposes an employee to information outside the

10  scope of the employee's original position. Dkt. #30 at 7 (sec. 4.1) (extending provision to include

11  product or service "about which Employee obtained or received Confidential Information").

12  Thus, even as Amazon extracts the benefit of its employees' varied abilities and backgrounds

13  beyond the employees' core responsibilities, Amazon gains greater leverage should an employee

14  ever seek to leave its employ.

15         Amazon could have easily crafted a noncompete provision more targeted to the position

16  it hired Moyer to perform. Amazon could have limited the noncompete to financial services

17  sales. If the sale of cloud computing to healthcare customers is as similar to sales to financial

18  services customers as Amazon represents, Amazon could have reasonably restricted Moyer from

19  both future financial services and healthcare sales positions. If Amazon's concern is with

20  individual competitors, it could have identified those competitors. If Amazon's concern is with

21  the information it shared with Moyer beyond that related to financial services, Amazon could

22  have negotiated expansions to the noncompete provision to assure continued protection. Amazon

23  did not limit the provision in any way. Rather, Amazon leaves it to the Court to draft a restriction

24  that reasonably protects its interests.

ORDER – 14

The Court does not look favorably on Amazon's apparent practices. *Powers*, 2012 WL 6726538 at *10 ("[T]he court is not inclined to defer to [Amazon's] one-size-fits-all contractual choices."). The Court is especially aware that all but the most advantaged employees are unlikely to combat Amazon's broad claims. Amazon no doubt relishes its opportunity to exert pressure and control over its departing employees. But the facts of this case do not present this commonly inequitable scenario. Moyer, possibly enjoying some support from Google Cloud, is fully able to protect his interests and undoubtedly was aware of and agreed to a limitation on his post-separation employment. Dkt. #45 at ¶¶ 7–11.

### c. Reformation of the Agreement is Appropriate

As a result, the Court finds that some restriction is appropriate here. Moyer was exposed to Amazon's confidential information beyond that strictly involved in his position as Director of Sales for financial services. At a minimum, Moyer's position at Google Cloud will influence competition between AWS and Google Cloud in the healthcare sector. Indeed, Moyer himself recognizes that enforcement of some portion of the provision is reasonable. Dkt. #43 at 9 (heading indicating that provision "is an overly broad restraint on Moyer's post-Amazon employment that must be reformed"). Moyer likewise concedes, and the Court agrees, that he should be screened from participating in activities directly[10] related to the financial services vertical and customers. Dkt. #43 at 23. Accordingly, the Court considers restraints that are reasonable to further protect Amazon's interests.

---

[10] The Court recognizes that Moyer will also be involved in helping set higher level strategy touching on other industry verticals, including financial services. This potential harm is likely mitigated to a substantial extent because Moyer may not disclose confidential information and will not be the only decision maker involved.

### d. Protection of Relationships and Goodwill

The Court first considers protection of Amazon's interests in its customer relationships and goodwill. In so doing, the Court concludes that Moyer is reasonably restrained from any contact with any financial services customers. Moyer's established relationships with existing AWS financial services customers would obviously allow for unfair competition. Additionally, Moyer's knowledge of Amazon's confidential financial services information would naturally influence his contacts with those customers, even if he did not disclose confidential information. Both Moyer and AWS's existing customers know of AWS's service offerings, strengths, weaknesses, and ongoing issues. Moyer's knowledge would allow him to unfairly highlight Google Cloud's strengths and target AWS's weaknesses. Even if Moyer did not disclose Amazon's confidential information, existing users would be likely to pick up on hints and obscure characterizations. Similarly, but to a lesser extent, Moyer's experience with Amazon's financial services vertical would result in unfair competition as to potential AWS/Google Cloud financial services customers. Moyer would again be able to provide Google Cloud a competitive edge in determining how to sell to potential financial services prospects. The Court finds it reasonable to restrain Moyer from contacting both groups.

Outside of the financial services sector, the Court also finds it reasonable to restrain Moyer from contacting existing AWS customers, including healthcare customers. Amazon has established relationships and goodwill with its existing customers and Moyer would be able to unfairly jeopardize and harm those relationships. This again strikes the Court as the essence of noncompete clauses. Moyer's inside knowledge allows him to unfairly exploit AWS's weaknesses in casting Google Cloud as the correct choice.

The Court does not find that this restraint should reasonably be extended beyond AWS's existing customers, including potential healthcare customers.[11] Because Moyer is prohibited from disclosing Amazon's confidential information, any competitive advantage would have to come from intimation and inference. But potential customers are far less likely to understand the nuances of AWS and Google Cloud services. The playing field is substantially evened, and Google Cloud and Amazon are left in much the same positions they currently find themselves. Restraining Moyer's contact with potential customers in such a way is not reasonable to protect from a speculative advantage.

### e. Internal Google Cloud Activities

Outside of activity related to financial services, the Court does not find that a restraint on Moyer's internal Google Cloud activities is reasonable. Moyer's Google Cloud job duties will be categorically like his responsibilities at AWS.[12] Moyer will be involved in setting sales

---

[11] As discussed further below, the Court does not find that Moyer was exposed to confidential information related to healthcare sales to create a competitive advantage. Of note, Moyer establishes that he never interacted with AWS healthcare customers in his position with Amazon. Dkt. #43 at 14 (summarizing Moyer's deposition testimony that he "did not sell to healthcare customers, did not have direct conversations with or collect feedback from healthcare customers, and was not exposed to the AWS messaging, partnerships, or marketing that was used with healthcare customers") (citing Dkt. #49-4 72:12-73:12, 74:9-75:9)); Dkt. #49-3 at 141:6–14 (Moyer's AWS manager is unable to identify an instance where Moyer talked to a non-financial services customer in a sales setting). Amazon does nothing to rebut this.

[12] As laid out by his future manager, Robert Enslin, Moyer's position at Google Cloud is anticipated to include many similar duties:

- Moyer will "[e]xecute strategy for healthcare in Google Cloud". As VP, Moyer will be "involved in formulating the sales strategy for [his] particular vertical and go-to-market. They are not involved [in] determining which products come to market, how those products come to market, how pricing is – is determined. So, to be clear, he's responsible for how his team approaches the customer and how they present their business case." Dkt. #51 at 53:2-15.
- Moyer will "manage the sales and the customer facing teams," "have relationships with the independent software vendors," "build his sales team," "negotiate pricing in terms and

strategies, identifying and addressing barriers preventing industries from adopting cloud services, and raising customer issues internally for possible action by development teams. Even without disclosing confidential information, Moyer may influence the approaches taken by Google Cloud. But the Court finds that restraining these categorical responsibilities is only reasonable as they relate to financial services customers.

Moyer provides evidence establishing that his AWS work was primarily limited to financial services and independent of the healthcare vertical. *See* Dkt. #43 at 2 ("Financial Services Business Unit has its own sales team, business development team, marketing team, and partners team due to the unique needs of financial services customers.") (citing Dkt. #49-2 at 50:13–51:11). Moyer's team "sold AWS services to the 32 largest United States-based global financial services companies." Dkt. #46 at ¶ 20. The needs of Moyer's AWS financial services customers and healthcare customers are different as there are "entirely different ecosystems" of ISVs within each industry and different regulations and regulators at play. *Id.* at ¶ 16. Moyer explains that cloud computing solutions are built for customers with a combination of cloud services and that the services he sold to financial services customers are largely distinct from those needed by healthcare customers. *Id.* at ¶¶ 14–15. On this record, Amazon has not established that restraining Moyer from serving as Google Cloud's VP of Healthcare is reasonable to protect its interests.

discounts with the companies he dealt with based on the price lists and standard documentation and approvals that are placed at Google Cloud." *Id.* at 98:6–99:6.
- Moyer will also coordinate with the technical deal blockers team to address technical deal blockers. Blockers are things that customers believe inhibit them from converting to cloud services. Sales works with the customers to determine whether there really is a blocker and whether there is a work around. *Id.* at 148:17–151:7. However, the sales team does not have any real control as the product management team determines which services to focus on and roll out. *Id.* at 139:1–24.

The record also leaves the Court with serious questions as to how much confidential information Moyer recalls outside of financial services, further supporting the Court's conclusion. *See Powers*, 2012 WL 6726538 at *5 (noting that employee may not remember confidential information stored only in his memory). The Court does not mean to imply that Amazon must somehow prove what Moyer remembers—a seemingly impossible standard. Rather, the Court's conclusion indicates that while Amazon establishes that Moyer was exposed to a broad range of confidential information, it was generally tangential to his role inside the financial services vertical. Amazon often overstates Moyer's involvement with strategy and development outside of the financial services vertical.[13] *Compare* Dkt. #22 at ¶ 17 (characterizing Moyer as investing heavily in cross vertical initiatives and that "[w]ith Moyer's assistance, AWS developed" a service planned for mid-2020 release) *with* Dkt. #22-9 (Moyer copied as an optional attendee on two meeting invites attaching preliminary planning documents for discussion without indication that he attended) *and* Dkt. #46 at ¶ 51 (Moyer indicating that he provided three verbal opinions in aid of drafting initial planning documents, introduced development team to account managers, and attended a single phone meeting).

Likewise, Amazon stretches its expert's opinion to argue that "[t]he limited evidence that was retrievable showed that Moyer was reviewing highly confidential materials [on his work laptop] up until the eve of his departure." Dkt. #19 at 16 (citing Dkt. #36 at ¶ 12; Dkt. #52). But Amazon's expert does not testify that Moyer viewed any individual files, only that he opened folders containing the documents. Dkt. #36 at ¶¶ 11–12 ("database records file 'thumbnails' appearing when a user opens a folder full of files"). Amazon does establish that Moyer viewed documents in April and May, just prior to his departure. Dkt. #31 (listing document access logs).

---

[13] The exception is one document related to ISVs, but the substantive work on that was completed in approximately May of 2018. Dkt. #22-11; Dkt. #50-16.

ORDER – 19

But the record does not support the inference that the access was outside of Moyer's work for AWS, that Moyer's review was deeper than surface level, or that Moyer remembers the contents of the files. S*ee also* Dkt. #43 at 17–20 (citing to instances in the record indicating Moyer had limited involvement or memory).[14]  On the whole, Amazon establishes that Moyer had some exposure to confidential information outside of the financial services vertical.  But Amazon does not establish that Moyer is reasonably restrained from being Google Cloud's VP of healthcare to protect the general and conceptual knowledge Moyer gained at Amazon outside of the financial services vertical.

Moyer is in sales.  Ultimately, the services themselves must be sold to the customer. Amazon and Google already compete for sophisticated customers in the healthcare sector. Contracting decisions are most likely to be on the merits of the services.  Without disclosing confidential information, Moyer is unlikely to alter the development of Google Cloud services to any appreciable extent.  Restraints on his actions become less reasonable as they stray further from specific information and customer contacts Moyer formed while working for AWS. Amazon may not unreasonably restrain Moyer's occupational field and his ability to capitalize on his general knowledge, skills, and sales experience.[15]

**C. Irreparable Harm**

The Court finds its conclusions further supported by its consideration of irreparable harm. Amazon bears the burden of demonstrating that "irreparable injury is *likely* in the absence of an injunction."  *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.,*736 F.3d 1239, 1249 (9th Cir. 2013) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S.

---

[14] The Court notes that Amazon did little in its reply to contest this portion of Moyer's brief.

[15] The Court does not find it necessary, in this case, to consider "whether enforcing the covenant would injure the public through loss of the employee's service and skill."

ORDER – 20

7, 22 (2008)) (emphasis in original). The mere possibility of irreparable harm is "too lenient" of a standard. *Id.* So long as there is concrete evidence in the record, "[e]vidence of loss of control over business reputation and damage to goodwill [can] constitute irreparable harm." *Herb Reed Enterprises, LLC v. Florida Entertainment Management, Inc.*,736 F.3d 1239, 1250 (9th Cir. 2013). But irreparable harm is not established by platitudes that do not establish "whether 'irreparable injury is *likely* in the absence of an injunction' . . . [or] whether legal remedies, such as money damages, are inadequate." *Herb Reed*, 736 F.3d at 1250 (quoting *Winter,* 555 U.S. at 22) (emphasis in original). Irreparable harm will not be presumed where a plaintiff presents no proof beyond speculation that its reputation or goodwill in the market will be damaged, because the Court has no way of evaluating this intangible harm. *See Mirina Corp. v. Marina Biotech*, 770 F. Supp. 2d 1153, 1162 (W.D. Wash. 2011).

The Court agrees with Amazon's argument that the type of damages caused by violation of noncompete provisions are often irreparable. Dkt. #55 at 8, n.24. There is no simple way to identify, quantify, and compensate harms to competitive advantage and establishment of market share. But, the fact that the harms themselves are irreparable does not mean that they are likely. In this case, the likelihood of harm is also correlated to the closeness of Moyer's relationship with the customer. Moyer is very likely to harm Amazon if he contacts his former AWS financial services customers. Less so with potential Google Cloud/AWS financial services customers. Still less with existing AWS healthcare customers. And still less with potential Google Cloud/AWS healthcare customers.

//

//

//

The likelihood that Moyer will irreparably harm Amazon's competitive advantages further decreases outside of customer relationships.[16] Such harm is premised on Moyer guiding Google Cloud, without disclosing confidential information, to unfairly compete with Amazon. The most likely harm would seem to flow from Moyer being involved in setting Google Cloud's healthcare sales strategies. But Moyer is no expert on AWS's sales strategies to healthcare customers. At most he may have gleaned some insight from his presence or involvement in discussions of AWS's plans more generally.[17] But Google Cloud has presumably already developed its own sales strategies. Moyer may elect to merely implement those strategies. While he will no doubt have a significant impact on the approach Google Cloud takes, Moyer will not be the sole decisionmaker in many of the competitive decisions. This record does not support the conclusion that Amazon will be irreparably harmed if Moyer is not restrained from selling Google Cloud services to prospective healthcare customers.

The likelihood of irreparable harm diminishes even further when considering Moyer's potential impact on the development of Google Cloud services and features. Moyer is not a developer. Without disclosing confidential information, the Court struggles to see how Moyer is likely to lead timely development of Google Cloud services to compete with AWS services that are already being developed. First, the services may not even transfer to Google Cloud's current offerings. Second, it may not be possible to develop competing services within Google

---

[16] The exception, again, relates to financial services. As the Court already noted, Moyer should be screened from participating in activities directly related to the financial services vertical or customers.

[17] Moyer successfully calls into question Amazon's argument that Moyer and Google Cloud will unfairly compete because Moyer knows of Amazon's pricing and negotiation strategies. Dkt. #50-3 at 130:4–133:25 (establishing that the foundation of pricing is public, and that Moyer did not control and was minimally involved in calculating offers during negotiations).

ORDER – 22

Cloud's framework. Third, Google Cloud is presumably already planning its own services to seek what it expects to be its own competitive advantage. So removed, the harm is speculative.

On the current record, the Court finds that Amazon has demonstrated a likelihood of irreparable harm only if Moyer is not restrained from contacting his former AWS financial services customers, potential Google Cloud/AWS financial services customers, and existing AWS customers. Further, Amazon has demonstrated a likelihood of irreparable harm if Moyer participates in activities directly related to Google Cloud's financial services vertical or customers.

**D. Balance of Hardships and Public Interest**

The Court does not consider a balancing of the hardships in this case to be particularly instructive. Amazon's primary hardship in the absence of the relief it seeks appears to be the possibility that its confidential information will be used to its competitive disadvantage. But this is a hardship that exists any time Amazon chooses not to retain an employee. If the Court granted Amazon the relief it seeks, the hardship on Moyer appears to be the possibility that Google Cloud no longer wants to employ him and that he faces severely limited employment opportunities in his chosen field of cloud computing sales. This certainly would be a significant hardship, but one that he ultimately agreed too. The Court believes that its resolution has otherwise struck the appropriate balance between these hardships.

**E. Bond**

Federal Rule of Civil Procedure 65 provides that this "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). The Ninth Circuit has recognized that Rule 65 "invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier,*

572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday,* 320 F.3d 906, 919 (9th Cir. 2003)) (quotation marks omitted).  For example, "the district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.*

Amazon requests that the Court dispense with the requirement to post a bond, indicating that Google will continue to employ Moyer.  Dkt. #19 at 25.  Moyer does not contest the request and the Court finds it appropriate.  The Court therefore sets the required bond amount at zero.

## IV.   CONCLUSION

Having reviewed Plaintiff's Motion, the responsive briefing, and the remainder of the record, and after hearing oral argument, the Court finds and ORDERS:

1.  Amazon's Motion for Preliminary Injunction (Dkt. #19) is GRANTED in part.

2.  Pending a resolution of this matter on the merits (or November 22, 2020, whichever comes first), Philip Moyer is and shall be ENJOINED from:

    a.  Participating in activities directly related to Google Cloud's financial services vertical or customers;

    b.  Contacting any of his former AWS financial services customers;

    c.  Contacting any potential Google Cloud/AWS financial services customers; and

    d.  Contacting any existing AWS customers.

3.  This preliminary injunction is effective immediately.

4.  Amazon is not required to post a security bond.

    DATED this 24th day of October 2019.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE